485 A.2d 408

**Joann DAMBACHER, A Minor By Her Parents and Natural Guardians, William J. DAMBACHER and Joann Dambacher, and William J. Dambacher and Joann Dambacher In Their Own Right,**

v.

**Nicholas J. MALLIS, Jr., and Sears, Roebuck & Company and Commonwealth of Pennsylvania Department of Transportation.**

**Appeal of SEARS, ROEBUCK & COMPANY.**

Superior Court of Pennsylvania.

Argued Oct. 17, 1983.

Filed Nov. 27, 1984.

Petition for Allowance of Appeal Granted July 16, 1985.

24

26

28

Bernard J. Smolens, Philadelphia, for appellant.

Gustine J. Pelagatti, Philadelphia, for appellees.

Before SPAETH, President Judge, and WICKERSHAM, BROSKY, ROWLEY, WIEAND, JOHNSON and HOFF-MAN, JJ.

SPAETH, President Judge:

This is a products liability case arising out of an automobile accident. The product in question is a radial tire, and the allegations are that the tire was defective because it was not embossed with a warning not to mix it with non-radial tires, and that the accident occurred because the tire was mixed with non-radial tires.

Appellees, Joann Dambacher and her parents, were the plaintiffs, and appellant, Sears, Roebuck and Company, the supplier of the tire, was one of the defendants. A jury returned a verdict in favor of appellees. The trial court denied appellant's motion for judgment n.o.v. or in the alternative for a new trial, and granted appellees' motion for a new trial limited to damages. There are two principal

issues. The first issue is whether the trial court erred in ruling that certain of appellees' witnesses were qualified to express an opinion that in fact the accident did occur because the tires were mixed. We hold that the court did err, and we therefore order a new trial generally. The second issue concerns what instructions the trial court should give the jury at the new trial. We hold that the court should instruct the jury in accordance with *Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978). This means that the court should not instruct the jury to determine whether appellant's radial tire was "unreasonably dangerous" because it was not embossed with a warning not to mix it with non-radial tires. Nor should the court otherwise instruct the jury in negligence terms. Instead, the court should instruct the jury in terms of appellant's liability as a guarantor, responsible if the user of its product—the radial tire—was injured as a result of a defect in the product. The court should explain that if the jury finds that when the tire left appellant's control it lacked the warnings necessary to make it safe for its intended use, then the tire was defective, and appellant is liable for the harm caused by the defect.

 Although the legal issues presented will require extended discussion,[1] the underlying facts may be briefly

1. Appellant raises more issues than the two issues we have identified as the principal issues. Appellant challenges a number of the trial court's evidentiary rulings. Since we are ordering a new trial, we do not reach the issues raised by these rulings.

Appellant also contends that in instructing the jury on how to apportion liability, the trial court erred in stating that the Comparative Negligence Act, 42 Pa.C.S. § 7102, was to be applied. The issue has not been properly preserved for appellate review. To preserve an objection to a point for charge a party must specifically object to the charge as given. *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 322 A.2d 114 (1974). Here, while appellant did object to the trial court's reference to the Comparative Negligence Act in the charge, *see* Concurring and Dissenting At 442 n. 6, counsel did not state the basis of the objection. Counsel's failure to object with greater specificity might have been cured had a point for charge been submitted to the trial court. *See* Pa.R.Civ.P. 227.1(b)(1) (grounds for post-trial relief must be "raised in pre-trial proceedings or by motion, objection, point for charge, ....."). However, a point for charge on how liability was

stated. On November 6, 1977, Nicholas Mallis, a sixteen year-old high school student, discovered that the right front tire of his grandfather's 1971 Plymouth Fury was flat. He replaced the flat tire with a Sears radial tire. The other tires on the Plymouth were non-radial tires. The next day Nicholas gave seven fellow students a ride home from school in the Plymouth. One of the students was Joann Dambacher. As the youngsters left school, it was drizzling and the highway was wet, with leaves on the surface. Nicholas, driving at about 20 to 25 miles per hour, failed to negotiate an S-curve. He testified:

> As I went through the right-hand turn I braked. I went through the right hand turn, started going into the left hand turn, and the back of the car slid out. The back slid to the right ... It happened quick. As best I remember, the car slid a little sideways and towards the left lane, and it went off the embankment, into a tree.

R.R. 586a.

Joann suffered a fractured dislocation of the cervical spine, and was rendered a quadriplegic who will be confined to a wheelchair for life.

Joann's parents, William J. Dambacher and Joann Dambacher, on Joann's behalf and in their own right, sued

to be apportioned among the defendants if more than one were found liable was not submitted to the trial court. Moreover, following appellant's objection, the trial court clarified its charge on the apportionment of liability, without referring to the Comparative Negligence Act, N.T. Vol. X at 79–81, and appellant made no further objection to the charge. Even if the issue had been properly preserved up to this point, and it was not, appellant's post-trial motion was insufficient to preserve the issue. In the motion appellant only stated: "The Court erred in leaving it to the jury to apportion liability under the Comparative Negligence Act, ..." Again, appellant did not state its theory for challenging the trial court's instruction. (Indeed the statement may be read as an argument that the trial court, rather than the jury, should have apportioned liability). Neither did appellant state "how the grounds were asserted in pre-trial proceedings or at trial." Pa.R. Civ.P. 227.1(b)(2).

We find it unnecessary to address appellant's further arguments that contribution among the defendants should have been determined under the Uniform Contribution Among Tortfeasors Act, rather than under the Comparative Negligence Act, and that the trial court erred in ordering a new trial limited to damages.

Nicholas and his grandfather in negligence and Sears, in strict liability. Sears joined the Commonwealth of Pennsylvania, Department of Transportation, as an additional defendant on the theory that the S-curve was unsafe. Before trial, the Department of Transportation settled with the Dambachers for $87,500. The trial was before a jury, from May 6 to May 20, 1980. After a non-suit was entered in favor of Nicholas's grandfather, the jury returned a verdict in favor of Joann in the amount of $800,000, and in favor of her parents in the amount of $10,000, apportioning responsibility under the Pennsylvania Comparative Negligence Act 50% to Nicholas, 45% to Sears, and 5% to the Department of Transportation. Sears filed a motion for judgment n.o.v. or in the alternative for a new trial, and the Dambachers filed a motion for a new trial as to damages. The trial court, sitting en banc, denied Sears's motions, granted the Dambachers', and entered judgment against Sears as to liability, with delay damages.[2] Sears then filed this appeal, and only its liability is at issue, for the Department of Transportation has settled, as mentioned, Nicholas has not appealed, and the propriety of the nonsuit in favor of Nicholas's grandfather is not questioned. For convenience, in the discussion that follows we shall usually refer to Sears as appellant and to the Dambachers as appellees, without distinguishing between Joann and her parents.

### The admissibility of appellees' opinion evidence on causation

Appellees' theory of recovery against appellant was that appellant was strictly liable because the radial tire supplied

---

**2.** To state the trial court's action in more detail: By order dated May 20, 1981, the court denied Sears's motions for judgment n.o.v. or new trial; granted the Dambachers' motion for a new trial as to damages; denied Sears's motion to limit the verdict under the Uniform Contribution Among Tortfeasors Act; and denied the Dambachers' motion for delay damages. By amended order dated June 16, 1981, the court entered judgment against Sears as to liability. By second amended order dated June 16, 1981, the court, DOTY, J., dissenting, assessed delay damages of $44,240 for Joann Dambacher and $553 for her parents. Judge DOTY dissented on the ground that delay damages were premature in light of the court's order of a new trial as to damages.

to Nicholas's grandfather was not embossed with a warning not to mix it with non-radial tires.[3] In support of this theory, appellees introduced documentary evidence and the testimony of two witnesses that Nicholas's mixing of the tires caused the accident. Appellant in turn introduced evidence that if the mixing was dangerous, it was so only at high speeds, not at 20 to 25 miles per hour, the speed at which Nicholas was driving when the accident occurred.

■ It is settled that in a products liability case the plaintiff must prove that a defective product was the proximate cause of his injuries. *Sherk v. Daisy Heddon*, 498 Pa. 594, 450 A.2d 615 (1982); *Agostino v. Rockwell Manufacturing Co.*, 236 Pa.Super. 434, 345 A.2d 735 (1975). Appellant argues that "[t]he only testimony that a mixed fitment could have caused the accident was given by two of plaintiffs' [appellees'] witnesses, ... whom the court below permitted to testify as 'experts.' These witnesses were not qualified to give opinions on causation in this case, and therefore the verdict cannot be upheld on the basis of their opinions." Brief for Appellant at 36. Because of the trial court's error in ruling that appellees' two witnesses were

---

**3.** The following warning was contained in the brochure that accompanied the tire:

> Selection—IDEALLY, ALL FOUR TIRES SHOULD BE OF THE SAME CONSTRUCTION–TYPE (all bias ply, all bias-belted, or all radial) and of the same aspect ratio (all 82 series, all 78 series, all 70 series, or all 60 series). "Aspect ratio" refers to the ratio of the height of the tire in cross section to its width. For example, the cross section height of a "78 series" tires is 78% of its cross section width. If it is necessary to mix tire construction-types or aspect ratios, those with the highest traction capabilities should be mounted on the rear wheels, even on front-wheel drive vehicles.
> In general, traction capabilities are as follows: Radial (best), bias-belted (next), bias-ply (next). With respect to aspect ratios, the lower the series number, the greater the traction. For example, a 70 series tire can be expected to provide better traction than a 78 series tire of the same construction-type. Do not mix tires of different construction-type or aspect ratio on the same axle.
> Sizing—FOLLOW VEHICLE MANUFACTURER'S SPECIFICATIONS. It is acceptable and often beneficial to up-size one size, but tires smaller than vehicle specifications should never be used. All four tires should be the same size.
> R.R. 1055a.

qualified to express an opinion on causation, appellant argues, it is entitled not simply to a new trial but to judgment n.o.v.

**-a-**

It will be convenient to start with appellant's argument that it is entitled to judgment n.o.v., for in considering that argument we may assume, without deciding, that appellees' witnesses were unqualified to express an opinion on causation.

When we review an order denying a motion for judgment n.o.v., we must regard the evidence in the light most favorable to the verdict winner. Evidence supporting the verdict is to be considered, with the rest rejected, *Glass v. Freeman*, 430 Pa. 21, 240 A.2d 825 (1968), and "only when the facts are such that two reasonable persons could not fail to agree that the verdict was improper," *Cummings v. Nazareth Borough*, 427 Pa. 14, 25–26, 233 A.2d 874, 881 (1967), should we enter judgment n.o.v. *See McKnight v. City of Philadelphia*, 299 Pa.Super. 327, 445 A.2d 778 (1982).

Applying these principles here, we reject the testimony of appellant's witnesses and consider, in the light most favorable to appellees, the testimony of appellees' witnesses on causation. Both of these witnesses expressed the opinion that the mixing of the radial tire with three non-radial tires was a cause of the accident. Walter VanNess Pruyn testified as follows:

Q. What is your opinion?

A. It is my opinion that this accident was precipitated by a loss of control of the vehicle by the driver.

THE COURT: What do you mean by precipitated?

THE WITNESS: Initiated, caused to occur because of a combination of circumstances triggered by the mixing of a radial tire on the right front in combination with a cross ply belted tire on the left front of the vehicle which in combination with the highway surface, high-

way grade, curvature, inexperience of the driver, a lack of advanced knowledge of the potentialities for loss of control, the vehicle suddenly oversteered on the left turn and at the speed at which the vehicle was traveling the driver did not have time in which to correct, to react, to recognize possible solutions and to take action in the time distance available to him from the time the oversteer condition occurred and impact with the tree. R.R. 630a–31a.

William P. Kelly testified that with a radial on the right front and a non-radial on the left front, the chance of an accident increases. R.R. 338a. He called "ridiculous" the statement of appellant's expert witness, Sidney Bloor, that a mixed fitment of radial and non-radial tires will not cause erratic steering unless the automobile is travelling at 70 miles per hour or more, even on wet ground. R.R. 996a. Other testimony was presented regarding the weather and the condition of the road, of the tires, and of the Plymouth at the time of the accident.

■ This record demonstrates that appellant's argument for judgment n.o.v. has no merit. For by accepting the testimony of appellees' witnesses, and rejecting that of appellant's, the jury could find that the mixed fitment caused the accident. The trial court therefore properly denied appellant's motion for judgment n.o.v.

■ Appellant cites several cases in which judgment n.o.v. has been granted when expert testimony was found, on appeal, to have been incompetent. *Rennekamp v. Blair*, 375 Pa. 620, 101 A.2d 669 (1954); *Sinkovich v. Bell Telephone Company of Pennsylvania*, 286 Pa. 427, 133 A. 629 (1926); *Moyer v. Ford Motor Company*, 205 Pa.Super. 384, 209 A.2d 43 (1965). These cases are inapposite, for the court granted judgment n.o.v. not because it found the witness unqualified to express an opinion but because the opinion was so equivocal as to be legally insufficient. *See also Niggel v. Sears, Roebuck and Co.*, 219 Pa.Super. 353, 281 A.2d 718 (1971); *McCrosson v. Philadelphia Rapid Transit Co.*, 283 Pa. 492, 129 A. 568 (1925). When the

witness is unqualified, as appellant claims appellees' witnesses were, the proper remedy is a new trial, not judgment n.o.v. As our Supreme Court has said:

> Manifestly it would be unfair, where a party has relied upon a favorable ruling on evidence presented by him, to enter final judgment against him without affording him the opportunity to furnish competent proof of which he might have availed himself had the evidence submitted by him been rejected. The only remedy under such circumstances is to grant a new trial.

> *Hershberger v. Hershberger,* 345 Pa. 439, 29 A.2d 95 (1942).

*See also, Stewart v. Chernicky,* 439 Pa. 43, 266 A.2d 259 (1970); *Weaverling v. Smith,* 181 Pa.Super. 153, 124 A.2d 509 (1956).

**-b-**

In considering whether to order a new trial because of the trial court's ruling that appellees' witnesses were qualified to express an opinion on the cause of the accident, we must bear in mind that the ruling was within the sound discretion of the trial court. Accordingly, we will not order a new trial unless the ruling was such clear error as to constitute an abuse of discretion. *Handfinger v. Philadelphia Gas Works,* 439 Pa. 130, 266 A.2d 769 (1970); *George I. Reitz & Sons, Inc.,* 319 Pa.Super. 76, 465 A.2d 1060 (1983); *Grubb v. Albert Einstein Medical Center,* 255 Pa.Super. 381, 382, 387 A.2d 480 (1978); *Flavin v. Aldrich,* 213 Pa.Super. 420, 250 A.2d 185 (1968).

When a witness is offered as an expert, the first question the trial court should ask is whether the subject on which the witness will express an opinion is "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." McCormick on Evidence 33 (3d ed. 1984) (footnote omitted). *And see Commonwealth v. Leslie,* 424 Pa. 331, 227 A.2d 900 (1967); *Commonwealth ex rel. M.B. v. L.D.B.,* 295 Pa.Super. 1, 11, 440 A.2d 1192, 1197 (1982). If the subject is of

this sort, the next question the court should ask is whether the witness has "sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." McCormick on Evidence, *supra* at 33 (footnote omitted). *See also. In Re Involuntary Termination of Parental Rights*, 449 Pa..543, 297 A.2d 117 (1972) (expert witness must show special knowledge of very question upon which he promises to express opinion); *Kravinsky v. Glover*, 263 Pa.Super. 8, 396 A.2d 1349 (1979) (no error in qualifying witness as expert in psychology with special focus on driving phobia similar to plaintiff's); *Erschen v. Pennsylvania Independent Oil Co.*, 259 Pa.Super. 474, 393 A.2d 924 (1978) (witness who had no formal instruction or on-the-job training in origin of gas explosions not qualified as expert, notwithstanding qualifications as fire marshall); *Taylor v. Spencer Hospital*, 222 Pa.Super. 17, 292 A.2d 449 (1972) (error not to allow nurse experienced in handling psychiatric patients to testify about standards for restraints); Rule 702 of the Rules of Evidence for United States Courts and Magistrates (1979), and Advisory Committee's Note to the rule; 2 Wigmore, Evidence § 555, § 1918 (Chadbourn rev. 1979).

Without doubt, in this case the subject in question called for expert testimony. The jury had to decide whether the presence of a radial tire on the right front wheel of a 1971 Plymouth Fury could, when the other three wheels were mounted with non-radial tires, in some way cause the driver to lose control when driving between 20 and 25 miles per hour. *See* R.R. at 586a. This was a subject "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." McCormick, *supra*. Appellant identifies the "science, profession, business or occupation" as "physics, engineering, and vehicle road dynamics." Brief for Appellant at 39. This formulation, however, is too broad in that it may be understood as suggesting that only someone with a great deal of formal education would be qualified to testify on the

causes of the accident. It is nevertheless correct to say that no opinion on the cause of the accident could aid the jury in its search for truth unless offered by someone with knowledge, however gained, whether by formal education, experience, or both, of those principles of physics and engineering pertinent to determining how a vehicle will behave in the conditions in which the accident in which appellee was hurt occurred.

One of the witnesses offered by appellees as an expert, William P. Kelly, had worked for several years as an automobile mechanic and then as a service manager for an automobile dealer. R.R. 241a, 244a, 246a, 247a. In these positions he sometimes road-tested automobiles for inspection purposes, *id.* at 248a, including the kind of automobile involved in this accident, a 1971 Plymouth Fury, *id.* at 251a. The fact that Mr. Kelly was an expert mechanic was irrelevant, however, for the subject in question did not involve mechanics but vehicle-road dynamics, and Mr. Kelly had no qualifications in that subject. He "didn't specialize in any mechanical things" whatever in high school, *id.* at 255a, and did not attend college, *id.* at 256a; he "never studied engineering of any kind," *id.*, nor mathematics "[b]eyond trigonometry," *id.*, nor had he "taken any courses that involved the design of tires," *id.*, or that "dealt with the subject under whatever name of vehicle dynamics as affected by changes in the types or conditions of tires," *id.* at 256a, 264a. He had never worked for anyone "whose function was to test automobile performance as affected by change in the types or conditions of tires." *Id.* at 265a. The only technical literature Mr. Kelly had read on the subject of comparative effects on vehicle performance of radial and non-radial tires were the State Inspection Manual and service manuals put out by automobile makers such as Chrysler, the manufacturer of the Plymouth Fury. *Id.* at 268a–269a. He had "never read any technical articles published by a scientific or professional or engineering society or journal...." *Id.* (Even if he had read such articles, it is

apparent that neither his educational background nor his experience equipped him to understand them.)

On direct examination Mr. Kelly testified that he would not "pass an automobile for inspection that had on its front axle a radial and a bias belted tire [because of the] erratic steering conditions or erratic handling conditions that it can produce." R.R. at 285a–286a. In support of this opinion Mr. Kelly was permitted to read, without objection, from the Pennsylvania State Inspection Regulations on passing tires for inspection. The Regulations stated that "[r]adial ply tires shall not be used on the same axle with bias or belted-bias tires. . . . Mixing tires, size and type can produce dangerous and erratic steering performance including wander and fishtailing." *Id.* at 288a. Mr. Kelly was also permitted to read, without objection, from the Chrysler service manual for the 1971 Plymouth Fury. The manual stated that "[t]he use of radial tires is not recommended because of their harsh ride at low speeds and possible unfamiliar stability characteristics . . . . [Intermixing tires] will result in oversteer and could possibly cause spins on wet or icy roads. The safest policy is never intermix radial ply tires with bias belted tires or cross bias tires." *Id.* at 289a–291a. It is apparent, however, that anyone could have taken the stand to read these statements from the manuals. The manuals were evidence of what the Chrysler Company and Pennsylvania authorities thought about the possible effects of mixing tires, but they in no way qualified Mr. Kelly to say what he thought. One does not become an expert by reading manuals on a subject one is not capable of understanding.

Besides being an automobile mechanic, Mr. Kelly's other claim to being an expert on the effect of mixing tires was founded on his "personal experience in road testing 1971 Plymouth Furys . . . . that had a radial on one side of the front axle and a . . . bias belted tire on the other front axle . . . on wet ground." R.R. 333a–334a. Mr. Kelly said that

[t]he results, when we would road test this type of a car, on braking and turning would be sort of an erratic

situation, where there was no predictability at any given time on braking or on turning as to what the car might do.

*Id.* at 335a.

A test, however, is meaningless unless the person conducting the test knows what he is doing; he must understand the principles involved, and then design and conduct a test such that its results will implicate and depend upon those principles. For example, if the person does something to a liquid, and it turns blue, he must know enough of the principles involved to exclude the possibility that the liquid turned blue not because of what he did but for some other reason, such as the temperature of the room he was working in. Mr. Kelly designed and conducted no such test. The "road tests [he made] ... would be to determine by driving a car whether there is some mechanical problem with it that cannot be seen by visual inspection." *Id.* at 252a. The tests were not designed or conducted with the idea of testing the effect of mixing tires, but rather were simply incidental to State inspections. *Id.* at 253a. Thus, Mr. Kelly did not know whether, or how, the tires on the cars he road-tested were mixed. He could not recall a single instance of "test[ing] a car that in fact had tires not all of the same category." *Id.* at 254a. Furthermore, when he did road test cars, he "drove them in a normal manner." *Id.* at 255a. He "did not put them through any unusual or steering or other maneuvers." *Id.* When asked, "Did you ever undertake as an organized program of an investigation or an inquiry a program by which you made a series of test runs on any given automobile under one set of runs containing all non-radial tires and under the other set of runs some combination of radial and non-radial," he answered: "Not under any laboratory or set up test conditions, no." *Id.* at 267a. His testimony continued:

Q. And you've never run any series of tests with the same automobile running it eight or ten or twelve times through a particular course with all non-radials and then eight or ten or twelve times through the same

course with some combination of radial and non-radial?
You've never done that, have you?

A. I *could have* in the course of doing business.

Q. But do you remember any specific instance where
you did it for the purpose of making such a comparison?

A. Names and dates I can't give you. I *have* made
those comparisons, though.

Q. You've never done it on a 1971 Fury, to your knowledge, have you?

A. Again I couldn't give you names and dates and
places, but I *believe* that I have.

*Id.* at 267a (emphasis added).

■ Given Mr. Kelly's testimony, it is not surprising that
he did not produce any records of any sort. We are unable
to escape the conclusion that he was permitted to testify as
an expert because he *said* he was an expert. Nothing,
however, justified his opinion of himself; he had never
learned, either by education or by experience, the principles
of vehicle dynamics. And nothing warrants the belief that
what he said could have aided the jury in its search for
truth. Neither he nor anyone else knew either when or how
many tests he had made; or what mixture of tires was
involved in the tests; or what was done in the course of the
tests to determine whether the mixture had any effect on
the handling of the automobile; or what that effect was. It
was therefore clear error and an abuse of discretion to
permit Mr. Kelly to testify: he did not have "sufficient skill,
knowledge, or experience ... to ... aid the trier in his
search for truth." McCormick, *supra.*[4]

4. Since the trial court's admission of Mr. Kelly's testimony was alone
error requiring a new trial, we shall refrain from detailed comment
on the qualifications of appellees' other expert witness, Walter Pruyn.
Suffice it to say that neither does it appear that he had any relevant
knowledge of principles of vehicle dynamics, or that he had any more
experience road-testing automobiles with mixtures of radial and non-
radial tires than Mr. Kelly. *See* R.R. at 516a–521a. The assessment of
Mr. Pruyn's qualifications in *Flick v. James Monfredo, Inc.,* 356 F.Supp.
1143 (E.D.Pa.), *aff'd mem.* 487 F.2d 1394 (3d Cir.1973), applies equally
here. In holding that Mr. Pruyn was not qualified as an expert as to

The cases cited by appellees are not contrary to but rather support this conclusion. In *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974), a products liability case, a person was struck by a load of steel pipe that fell when a brake-locking mechanism on a crane malfunctioned. The trial court excluded, as unqualified, expert testimony of a safety engineer as to the safety of the design of the brake-locking mechanism. Reversing, the Supreme Court held that the safety engineer was qualified as an expert. Said the Court:

> Appellee points to the fact that Barbe was by his own admission a "safety engineer" rather than a mechanical engineer, and that he was not registered to practice mechanical engineering. From this it is argued that Barbe was not qualified to express an opinion on matters of design. But an engineer need not be registered as such in order to testify as an expert if his education and experience so qualify him. *Lance v. Luzerne County Manufacturers Association*, 366 Pa. 398, 77 A.2d 386 (1951). The standard of qualification is a liberal one: "If a witness 'has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his [testimony] is for the jury: [citations omitted] ....' *McCullough v. Holland Furnace Co.*, 293 Pa. 45, 49, 141 A. 631, 632 [(1928)]." *Id.*, 457 Pa. at 338–39, 319 A.2d at 924 (footnotes omitted).

Thus, the "subject under investigation" was whether a crane was safe, and the witness had "specialized knowledge" of the subject not only from experience in inspecting cranes, but also because he had been trained as an engineer and therefore knew, when he inspected a crane, what he was looking at. *Rutter v. Northeastern Beaver County School District*, 496 Pa. 590, 437 A.2d 1198 (1981) (plurality opinion), presented a similar situation. There, a high school

the speed of a motorcycle, the district court said, "Something more than the self-serving statement of a witness is required to qualify him as an expert in the absence of a proven record of achievements in his chosen field." *Id.* at 1149.

student was injured when playing "jungle football" without protective equipment and while under the supervision of two football coaches. In an action against the School District alleging negligence of the football coaches, the trial court refused to allow a former football coach to testify as an expert. Reversing, the Supreme Court said that "[i]t seems clear than an experienced former coach may have knowledge of the customs and safety standards utilized by coaches of high school teams and of the rules imposed [by authorities] to insure minimum safety...." *Id.*, 496 Pa. at 598, 437 A.2d at 1202. Thus, *Kuisis* and *Rutter* show both when a witness should be held qualified, and when he should be held not qualified. In *Kuisis* the witness was qualified by reason of both experience and education in the subject under investigation; in *Rutter*, by experience. If—like Mr. Kelly and Mr. Pruyn—the witness has neither experience nor education in the subject under investigation, he should be found not qualified.

The conclusion that the trial court should not have admitted the testimony of Mr. Kelly and Mr. Pruyn is further supported by other cases in which the scope of a witness's experience and education was examined as it bore upon the subject under investigation.

■■ Sometimes it may appear that the scope of the witness's experience and education embraces the subject in question in a logical, or fundamental, sense. In such a case, the witness is qualified to testify even though he has no particularized knowledge of the subject as such; for he will be able to reason from the knowledge he does have. Thus in *Whistler Sportswear, Inc. v. Rullo,* 289 Pa.Super. 230, 433 A.2d 40 (1981), a civil engineer was held qualified to testify on the causes of the collapse of a roof, even though his area of expertise was not specifically roof design. He was qualified because the "subject under investigation" did not require "knowledge of roofing *per se,* but rather ... knowledge of engineering principles of stress and resiliency and an ability to interpret the evidence left in the aftermath of the physical collapse." *Id.*, 289 Pa.Superi-

or Ct. at 238–39, 433 A.2d at 44. *And see Jones v. Tree-goob,* 212 Pa.Super. 482, 243 A.2d 161 (1968), *rev'd. on other grounds,* 433 Pa. 225, 249 A.2d 352 (1969) (plaintiff injured during windstorm when store window blew out; expert who has B.S. in industrial engineering, twenty-two years experience as safety engineer, and considerable knowledge of wind pressure and its effects, held qualified). *See also Dorsey v. Yoder Co.,* 331 F.Supp. 753 (1971) (witness who lacked familiarity with particular metal slitting machine but who as an engineer, in industry, armed forces, and at University of Pennsylvania where he was professor and Chairman of Graduate Division of Civil Engineering, had designed and worked with many machines that operated by same principles as the slitter, held qualified to testify as to hazards created by design of slitter).

 Other times it may appear that the scope of the witness's experience and education may embrace the subject in question in a general way, but the subject may be so specialized that even so, the witness will not be qualified to testify. Thus, every doctor has a general knowledge of the human body. But an ophthalmologist, for example, is not qualified to testify concerning the causes and treatment of heart disease. *See Arnold v. Loose,* 352 F.2d 959 (3rd Cir.1965) (striking testimony of orthopedic surgeon that in his opinion defendant's decedent had lapsed into diabetic coma, which was cause of automobile-truck collision, held not beyond trial court's discretion where witness admitted he had never read any text on diabetes or diabetic comas, did not know who was leading authority on diabetes or which was leading treatise, and revealed no other special knowledge in field of diabetes); *Hunt v. Bradshaw,* 251 F.2d 103 (4th Cir.1958) (radiologist not qualified to testify as to proper surgical procedure in chest operation); *Wesley v. State,* 32 Ala.App. 383, 26 So.2d 413 (1946) (toxicologist not qualified to testify wound inflicted with screwdriver or similar instrument); *Harris v. Campbell,* 2 Ariz.App. 351, 409 P.2d 67 (1965) (discretionary exclusion of general practitioner in malpractice action against gynecologist who per-

formed vaginal hysterectomy); *Huffman v. Lindquist*, 37 Cal.2d 465, 234 P.2d 34 (1951) (autopsy surgeon not qualified as to treatment for brain injury); *Moore v. Belt*, 34 Cal.2d 525, 212 P.2d 509 (1950) (autopsy surgeon not qualified as to existing standards in practice or urology); *Pearce v. Linde*, 113 Cal.App.2d 627, 248 P.2d 506 (1952) (specialist in internal medicine not qualified as to orthopedics); *Dolan v. Galluzzo*, 77 Ill.2d 279, 32 Ill.Dec. 900, 396 N.E.2d 13 (1979) (physician unlicensed in podiatry not qualified to testify in malpractice action against podiatrist); *Swanson v. Chatterton*, 281 Minn. 129, 160 N.W.2d 662 (1968) (internist not qualified as to orthopedic surgery); *State v. Askin*, 90 Mont. 394, 3 P.2d 654 (1931) (general practitioner not qualified to testify as to brain injury); *Whitehurst v. Boehm*, 41 N.C.App. 670, 255 S.E.2d 761 (1979) (orthopedic surgeon unfamiliar with practice of podiatry not qualified to testify as to standard of care required of podiatrist); *Capan v. Divine Providence Hospital*, 270 Pa.Super. 127, 410 A.2d 1282 (1980) (anesthesiologist not qualified as to autopsy report); *Cf. Kosberg v. Washington Hospital Center*, 394 F.2d 947 (D.C.Cir.1968) (internist held qualified to testify as to effects of electroshock therapy, even though not a psychiatrist or neurologist); *Baerman v. Reisinger*, 363 F.2d 309 (D.C.Cir.1966) (general practitioner qualified to testify that cardiologist was negligent in failing to diagnose hypothyroidism in patient over six year period of treatment); *State v. Staples*, 120 N.H. 278, 415 A.2d 320 (1980) (physician who had been general practitioner for over twenty years, had examined several rape victims, and had recently attended course covering psychological problems of rape victims could give opinion that victim's memory loss was due to mental block rather than intoxication).

Here, Mr. Kelly and Mr. Pruyn had no education on the subject of the effect of mixing radial and non-radial tires. While the scope of the experience they had had embraced the subject of tires in a general way, it did not embrace the specialized subject of the effect of mixing tires, and nothing

in their experience, or in such education as they had had, enabled them to reason about what that effect would be.

## The trial court's instruction to the jury on appellant's strict liability for a defect in the tire

Having concluded that a new trial is required because of the trial court's error in admitting the testimony of appellees' experts on the cause of the accident, we might refrain from ruling on the other issues that have been argued to us. However, one of those issues, in particular, the issue of how the trial court should instruct the jury on appellant's strict liability, may very well arise at the new trial. Accordingly, some discussion of it is warranted.

■ The first requirement that appellees will have to meet at the new trial will be to offer qualified expert testimony that the tire mixture was a proximate cause of the accident. If no such testimony is offered, the trial court will have no occasion to instruct the jury regarding appellant's strict liability, for in the absence of proof of causation, appellant's radial tire could not be found defective because it was not embossed with a warning not to mix it with non-radial tires. Suppose, for example, that A sells a bottled drink to B, and B pours the drink into a glass filled with ice-cubes, becomes ill, and sues A for selling a product defective because the bottle's label failed to include a warning not to mix the drink with ice-cubes. B will not make out a case for the jury unless he proves that mixing ice-cubes with the drink did in fact make him ill. If the mixing did not make B ill, there was no need to warn against the mixing, and therefore no defect in the bottle's label. Assuming, however, that appellees are able to present competent evidence of proximate cause at a new trial, that is, that they do offer the testimony of qualified experts, the issue will then arise whether appellant's radial tire was defective because it was not embossed with a warning not to mix it with non-radial tires. In that event, what will be the trial court's responsibility?

-a-

■ Appellant, relying on *Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978), argues that it will be the trial court's responsibility to rule, as a matter of law, that the radial tire was not defective. Accordingly, appellant concludes, instead of ordering a new trial, we should enter judgment n.o.v. in appellant's favor. We agree with appellant to this extent: under *Azzarello*, the trial court will have to rule *whether*, as a matter of law, the jury *could find* the radial tire defective. However, we find no merit in appellant's argument that when the trial court *makes* that ruling, it must conclude that the tire *was not* defective.

In *Azzarello* the question was whether in a products liability case the jury should be instructed to determine whether the product in question was "unreasonably dangerous." In considering this question, the Court recognized that before it could be answered, the respective functions of the trial court and the jury had to be defined. Said the Court:

It must be understood that the words, "unreasonably dangerous" have no independent significance and merely represent a label to be used where it is determined that the risk of loss should be placed upon the supplier. It is for this reason that a mere change in terminology does not supply the answer to the basic question as to what instructions should be given to the jury. The answer to the proceeding [*sic*] question rests upon the more fundamental question whether the determination as to the risk of loss is a decision to be made by the finder of fact or by the court. While a lay finder of fact is obviously competent in resolving a dispute as to the condition of a product, an entirely different question is presented where a decision as to whether that condition justifies placing liability upon the supplier must be made. 480 Pa. at 556, 391 A.2d at 1025 (footnotes omitted).

The Court then went on to hold that "[i]t is a judicial function to decide whether, under the plaintiff's averment

of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint." *Id.*, 480 Pa. at 558, 391 A.2d at 1026. The Court illustrated its holding by examples of the sort of questions a court is to ask:

> Should an ill-conceived design which exposes the user to the risk of harm entitle one injured by the product to recover? Should adequate warnings of the dangerous propensities of an article insulate one who suffers injuries from those propensities? When does the utility of a product outweigh the unavoidable danger it may pose? *Id.*

These questions, the Court said, are not for the jury but for the court, for they are "questions of law and their resolution depends upon social policy." *Id.*

In *Azzarello* the Court did not do what appellant argues the trial court should have done here—the Court did not explicitly formulate or resolve the question whether on the particular facts before it recovery for strict liability would be proper. However, the Court did affirm the trial court's order granting a new trial, and in doing so, it decided what jury instruction should be used on retrial. It is evident, therefore, that the Court regarded the case before it as one in which, on proper jury instruction, and on proof of the plaintiff's averment of the facts, recovery would be justified. The same may be said of this case.

In describing the respective functions of court and jury in a products liability case as compared with some other sorts of cases, Dean Wade has written:

> In an action for negligence it is normally the function of the jury to determine whether the defendant was negligent, subject, of course, to the authority of the judge to direct a verdict for the defendant, if he finds that the jury could not reasonably find for the plaintiff. On the other hand, in an action based on strict liability of the *Rylands* type, for an abnormally dangerous activity, the determination as to whether strict liability will be im-

posed for the activity is held to be one for the judge, not the jury—for the reason that the decision involves issues of general social policy. In the products cases the courts seem not to have approached the problem in this fashion. Instead, they seem to have assumed that strict products liability is like negligence in this respect, so that a plaintiff, in order to recover, must convince the jury that the product was "defective" or "unreasonably dangerous" or "not duly safe," or whatever test is used. This generally works quite satisfactorily when the question is whether the product was unsafe because of an error in the manufacturing process so that it was not in the condition in which it was intended to be. The issue then seems more factual, of the kind the jury is accustomed to handling. The difficulty comes when it is not just the single article which is to be classed as unsafe because something went wrong in the making of it, but a whole group or class or type which may be unsafe because of the nature of the design. It is here that the policy issues become very important ... It is here the court—whether trial or appellate—does consider these issues in deciding whether to submit the case to the jury. If a plaintiff sues the manufacturer of a butcher knife because he cut his finger, on the sole ground that the knife was so sharp that it was likely to cut human flesh, the court would probably take the case out of the hands of the jury and not give it the opportunity to find that the knife was unsafe. Similarly with an aspirin manufacturer, when an ordinary tablet stuck to the lining of the plaintiff's stomach and caused a hemorrhage, or the manufacturer of the Pasteur treatment for rabies, when there were untoward reactions. The problem in these cases is likely to be called one of law and decided by the court. Court control of jury action is more extensive here than in the ordinary negligence action. And yet, of course, if the court decides that it would be reasonable to allow the jury to find for the plaintiff, the issue of lack of due safety will be submitted to the jury even in these cases.

Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 838 (1973) (footnotes omitted).

In addition to there being certain products, there are also certain risks that as a matter of law, or social policy, cannot support imposition of strict liability. In *Lobianco v. Property Protection, Inc.*, 292 Pa.Super. 346, 437 A.2d 417 (1981), the plaintiff sued a burglar alarm company when her alarm system failed to operate properly and jewelry was taken from her home. The trial court held that the plaintiff could not recover in strict liability. This court affirmed, MONTGOMERY, J., joined by HESTER, J., dissenting. Two judges, BROSKY, J., joined by CAVANAUGH, J., affirmed on the ground that "the injury suffered by [the plaintiff; the loss of her jewelry] is not of the type for which strict liability ought to be imposed." *Id.*, 292 Pa.Superior Ct. at 363, 437 A.2d at 426. Three judges, SPAETH, J., joined by PRICE, J., with CERCONE, P.J., stating his "agree[ment] with the analysis," affirmed on the ground that under *Azzarello* the case should not go to the jury because " '[a]s a matter of social adjustment' [quoting Prosser, Law of Torts 495 [4th ed. 1971], the responsibility for protecting against the loss of the jewelry should, so far as the imposition of strict liability is concerned, be appellant's [the plaintiff's], not appellee's [the burglar alarm company's]." 292 Pa.Super. at 362, 437 A.2d at 425. This conclusion followed from the fact that to impose strict liability "would represent a less, not more, equitable allocation of the risk." *Id.*, 292 Pa.Superior Ct. at 360, 437 A.2d at 424. As between homeowner and manufacturer, the homeowner was in the better position to protect against the loss, for the homeowner knew the contents of the home sought to be protected by the burglar alarm and so could insure against their loss, whereas the manufacturer could not know the contents and therefore could protect itself against their loss only by increasing its price for its burglar alarms, which as a matter of social adjustment would be undesirable because it would result in "[t]hose of modest means ... subsidizing the rich." *Id.*, 292 Pa.Superior Ct. at 361, 437 A.2d at 425.

*Azzarello* and *Lobianco* are not unique in holding that there are certain products or risks against which the law of products liability is not meant to protect the user, and as to which the trial court should therefore rule as a matter of law that strict liability does not apply. *See, e.g., Daberko v. Heil, Co.,* 681 F.2d 445 (5th Cir.1982) (Tex. law) (manufacturer not strictly liable for injuries as a matter of law when truck redesigned after sale); *Dubin v. Michael Reese Hospital,* 83 Ill.2d 277, 47 Ill.Dec. 345, 415 N.E.2d 350 (1981) (strict liability not applicable in action to recover from hospital for overdose of radiation); *Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374 (1984) (collecting New Jersey cases: hospitals not liable for injuries from hepatitis-infected blood transfusion; dentist not liable for injuries when hypodermic needle breaks in the jaw); *O'Brien v. Muskin Corp.,* 94 N.J. 169, 186, 463 A.2d 298, 307 (1983) ("If the minds of reasonable men could not differ on whether the risks posed by a product outweigh its utility or vice versa, then the court could make the appropriate determination as a matter of law"); *Atkins v. Arlans Department Store of Norman, Inc.,* 522 P.2d 1020 (Okla. 1974) ("lawndart" not unreasonably dangerous as a matter of law since dangers readily apparent); *Silverhart v. Mount Zion Hospital,* 20 Cal.App.3d 1022, 98 Cal.Rptr. 187 (1971) (doctrine of strict liability not applicable to injuries sustained when hospital equipment breaks during surgery).

Courts and commentators have identified various factors that a court should consider when making the social policy decision required by *Azzarello,* and made in *Lobianco.*[5]

5. The California Supreme Court has identified the following factors: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; the financial cost of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design. *Barker v. Lull Engineering Co., Inc.,* 20 Cal.3d 413, 431, 143 Cal.Rptr. 225, 237, 573 P.2d 443, 455 (1978). Dean Wade has formulated a similar list:
(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

Sometimes, no doubt, it will be difficult for a court to decide whether as a matter of social policy a jury should be permitted to impose strict liability. However, where inadequate warnings are alleged, the social policy decision is relatively simple. As has been said, "In the case of an inadequate warning, ... imposing the requirements of a proper warning will seldom detract from the utility of the product." *Freund v. Cellofilm Properties, Inc.,* 87 N.J. 229, 238 n. 1, 432 A.2d 925, 930 n. 1 (1981). At the same time, the cost of adding a warning, or of making an inadequate warning adequate, will at least in most cases be outweighed by the risk of harm if there is no adequate warning.

Accordingly, the trial court was entitled to rule, at the trial that has been held, and will again be entitled to rule, at the new trial, that as a matter of social policy this is a case in which a jury, on proper instruction and proof, can impose strict liability.[6]

### –b–

With the foregoing conclusion on social policy reached, it is in order to consider how the trial court should

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

Wade, *supra* at 837–38 (footnote omitted).

6. Nothing in *Azzarello* precludes a supplier or manufacturer, by appropriate motion, from asking the trial court to make explicit its ruling on the threshold determination of social policy that *Azzarello* requires. In the absence of such a motion, it will be presumed that the court, by permitting the case to go to the jury, resolved the threshold determination against the defendant.

instruct the jury to decide whether appellant may be found strictly liable because the radial tire was not embossed with a warning not to mix it with non-radial tires. Appellant argues that in instructing the jury the trial court "failed to develop [the] careful distinction between insurer and guarantor" developed in *Azzarello*. Brief for Appellant at 32. While we agree that the trial court should have explained the difference between an insurer and a guarantor, and believe that its instruction could have been fuller—a matter we shall discuss—nevertheless we find the instruction substantially in accordance with *Azzarello* and therefore reject appellant's argument that the instruction as given requires a new trial. We are also not persuaded by Judge WIE-AND's argument that a new trial is in order not only, as we hold, because of the trial court's error in ruling that appellees' witnesses were qualified to express an opinion on causation, but also because the instruction was not in negligence terms. Rejecting *Azzarello* in favor of what it he characterizes as "the better approach," Judge WIEAND maintains that the trial court should have instructed the jury that "[t]here can be no liability for a failure to warn without a showing that the defendant supplier failed to give reasonable warning of risks or hazards of which he knew or should have known." Concurring and Dissenting at 437. It is our view that we are not thus free to reject *Azzarello*, but further, that if we were, we should not, for we believe that the distinction, so emphasized by *Azzarello*, between products liability cases and negligence cases should be maintained.

We may start our discussion of this point by noting that three sorts of cases should be distinguished.

In what might be called the "traditional" strict liability cases, in which the defendant has engaged in an ultrahazardous activity that cannot be made safe, the defendant is held to be an "insurer" as to injuries that the activity has caused. The point is not that there is anything wrong with the activity, but rather that because of its dangerousness the defendant may be held strictly liable for

the injuries the activity caused. *See* Prosser, *supra* at 505–16; Restatement (Second) of Torts §§ 519, 520 (1965).

■ In a products liability case, such as this case, in contrast, the defendant—the manufacturer or supplier of the product—is not an "insurer" but "effectively the guarantor of his product's safety." *Salvador v. Atlantic Boiler Co.,* 457 Pa. 24, 32, 319 A.2d 903, 907 (1974). The plaintiff must therefore prove that the product that caused his injury was defective, or "unsafe for its intended use." *Id.* If the defendant were the insurer of its product, liability would follow upon a finding that the plaintiff was injured while using the product: the fact that injury occurred would lead to the conclusion that the product was unsafe in *some way.* But the jury is not to find liability when the product is unsafe in some way; liability may be imposed only on proof that the product lacked an element necessary to make it *safe* for its *intended use.* As the Supreme Court said in *Berkebile v. Brantly Helicopter Company,* 462 Pa. 83, 337 A.2d 893 (1975):

> Thus, the plaintiff cannot recover if he proves injury from a product absent proof of defect, such as developing diabetic shock from eating sugar or becoming intoxicated from drinking whiskey. Neither can plaintiff recover by proving a defect in the product absent proof of causation, as where the plaintiff sustains eye injury while not wearing defective safety glasses.

*Id.,* 462 Pa. at 94, 337 A.2d at 898.

■ Finally, in a negligence case the plaintiff must prove, not only that the product was defective and that the defect caused his injury, but in addition, that in manufacturing or supplying the product the defendant failed to exercise due care. The defendant is liable neither as an insurer nor guarantor but rather only for failing to act as a reasonable man would have acted. *See Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680 (1983); *Macina v. McAdams,* 280 Pa.Super. 115, 421 A.2d 432 (1980).

The adoption of these distinctions in the law of Pennsylvania may be dated from the Supreme Court's decision in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). There the Court adopted Section 402A of the Restatement (Second) of Torts, which provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to. liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965).

In *Salvador v. Atlantic Steel Boiler Co., supra,* the Court reaffirmed its adoption of Section 402A, stating:

Today, ... a manufacturer by virtue of section 402A is effectively the guarantor of his products' safety. See *Webb v. Zern, supra; Kassab v. Central Soya, supra* [432 Pa. 217, 246 A.2d 848 (1968)]. Our courts have determined that a manufacturer by marketing and advertising his product impliedly represents that it is safe for its intended use. We have decided that no current societal interest is served by permitting the manufacturer to place a defective article in the stream of commerce and then to avoid responsibility for damages caused by the defect. He may not preclude an injured plaintiff's recovery by forcing him to prove negligence in the manufacturing process. Webb v. Zern.

457 Pa. at 32, 319 A.2d at 907.

■ In *Berkebile v. Brantly Helicopter Corporation, supra,* the Supreme Court was required to distinguish between a case in which the defendant had been sued—as appellant here has been sued—in strict liability for having failed to provide adequate warnings, and a negligence case. The trial court had failed to make the distinction, defining "defective condition" for the jury in negligence terms. Reversing, the Chief Justice, joined by Justice (now Chief Justice) NIX, stated:

> The seller is responsible for injury caused by his defective product even if he "has exercised all possible care in the preparation and sale of his product." Restatement (Second) of Torts, § 402A(2)(a). As we declared in *Salvador, supra,* 457 Pa. at 32, 319 A.2d at 907, the seller "may not preclude an injured plaintiff's recovery by forcing him to prove negligence in the manufacturing process." What the seller is not permitted to do directly, we will not allow him to do indirectly by injecting negligence concepts into strict liability theory.

> 462 Pa. at 94, 337 A.2d at 899.

Examining Section 402A, the Chief Justice noted that it appears to "impose a contradictory burden of proof in that [the product must be both defective and] also be 'unreasonably dangerous.'" *Id.,* 462 Pa. at 95, 337 A.2d at 899. However, citing Dean Prosser, the Chief Justice explained that the term "unreasonably dangerous" was included in Section 402A "to foreclose any argument that the seller of a product with inherent possibilities for harm would become 'automatically responsible for all the harm that such things do in the world.'" *Id.* (quoting Prosser, Strict Liability to the Consumer in California, 18 Hast.L.J. 9, 23 (1966)). In other words, the term "unreasonably dangerous", as used in Section 402A, does not import negligence principles into a strict liability case, but rather prevents a supplier sued in strict liability from being held liable as an insurer instead of as a guarantor. Following the California Supreme Court's analysis in *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104

Cal.Rptr. 433, 501 P.2d 1153 (1972), the Chief Justice held that

> the "reasonable man" standard has no place in a strict liability case ... To charge the jury or permit argument concerning the reasonableness of a consumer's or seller's actions and knowledge, even if merely to define "defective condition" undermines the policy considerations that have led us to hold in *Salvador* that the manufacturer is effectively the guaranter [*sic*] of his product's safety. 462 Pa. at 96–97, 337 A.2d at 900 (JONES, C.J.)

The precedential authority of *Berkebile* was for a time uncertain, for, as noted, only Justice NIX had joined in the Chief Justice's opinion. This uncertainty, however, was removed by the Supreme Court's decision in *Azzarello*. There the Court, in a unanimous opinion by Justice NIX, cited with approval and adopted the Chief Justice's opinion in *Berkebile*. In doing so, the Court went one step further than it had in *Berkebile*. In *Berkebile* the Chief Justice had explained that the term "unreasonably dangerous", as used in Section 402A, does *not* import negligence principles into a strict liability case. In *Azzarello* the Court further decided, as we have already discussed, that what the term "unreasonably dangerous" *does* do is to impose on the trial court the responsibility of deciding, as a matter of law and by resolving considerations of "social policy", whether "the risk of loss should be placed upon the supplier." 480 Pa. at 556, 391 A.2d at 1025. Emphasizing its previous decisions that the supplier's liability is that of a guarantor, not an insurer, the Court went on to outline a jury instruction for use "in products liability cases in this Commonwealth," *id.*, 480 Pa. at 549, 391 A.2d at 1022, stating that "the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Id.*, 480 Pa. at 559, 391 A.2d at 1027 (footnote omitted).

It may well be that as an intermediate appellate court we should end our discussion at this point: the line of authority established by *Webb, Salvador, Berkebile,* and *Azzarello* is

clear and therefore binding on us. Nevertheless, out of deference to Judge WIEAND's position that the line of authority is not clear, we shall explain why we regard it as sound and deserving to be followed, quite apart from its precedential authority.

 It may be noted first that there are difficulties in thinking of an inadequate warnings case as a products liability case. Products liability cases fall into two categories: manufacturing defect cases and defective design cases. In a manufacturing defect case, the question whether the product is defective is relatively simple. Since the allegation is that something went awry in the manufacturing process, so that, for example, the product lacked a component it should have had, the finder of fact need only compare the product that caused the injury with other products that were manufactured according to specifications. In a defective design case, however, the question is whether the product should have been designed more safely. While an inadequate warnings case has been characterized as a kind of defective design case, *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971), the term "defective" does not easily fit when applied to warnings. For in a warnings case it is not alleged that there was anything wrong with the product's *design as such.* Rather, a "defect" is supposed to exist because the user was not adequately instructed on *how to use* the product *as the product was designed.*

 The way to overcome the possible misunderstanding of the term "defective" in an inadequate warnings case is not, as Judge WIEAND would do, to instruct the jury in negligence terms, but to explain to the jury that it is to consider whether the product was safe in the absence of warnings or in light of the warnings that were given. *See Freund v. Cellofilm Properties, Inc.,* 87 N.J. 229, 243, 432 A.2d 925, 932 (1981) ("adequate warning is one that includes the directions, communications, and information essential to make the use of a product safe."); *cf. Little v. P.P.G. Industries, Inc.,* 92 Wash.2d 118, 122, 594 P.2d 911, 914 (1979) ("The question is: Was the warning sufficient to catch the attention of persons who could be expected to use

the product, to apprise them of its dangers and to advise them of the measures to take to avoid those dangers."); *Cavers v. Cushman Motor Sales*, 95 Cal.App.3d 338, 342, 157 Cal.Rptr. 142, 144 (1979) (approving jury instruction: "An article otherwise appropriately made and maintained is defective ... if the manufacturer ... fails to adequately warn of dangerous propensities of such article which in the absence of an adequate warning renders the article substantially dangerous."). Thus, there is no necessity, such as Judge WIEAND suggests, to depart from strict liability principles when inadequate warnings are alleged. The emphasis need only be altered slightly to focus not so much on the product itself as on the safety of the product in light of the warnings that the seller gave, or failed to give.[7]

Judge WIEAND quotes Keeton, that "[a]lthough this ground of recovery [*i.e.*, recovery in strict liability for failure to give adequate warnings] is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability better described as the sale of a product in a defective condition." Concurring and Dissenting at 435, quoting Keeton, The Meaning of Defect in Products Liability Law—a Review of Basic Principles, 45 Mo.L.Rev. 579, 586–87 (1980). From this we understand that in Judge WIEAND's opinion, it does not matter in a case such as this one whether negligence or strict liability principles are applied. However, in some cases it will matter, for the *proofs* will differ according to which principles are applied,

7. It has been suggested that in an inadequate warnings case the seller's liability may be decided not by asking whether the seller exercised that degree of care that an ordinary reasonable person would have exercised in the circumstances, but through a risk/utility analysis. *See O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d 298 (1983). However, risk/utility analysis is not well suited to an inadequate warnings case, for in a warnings case, as distinguished from a defective design case, the utility of a product will remain constant whether or not a warning is added, but the risk will not. In a defective design case, in contrast, it may be expected that a change in design may detract from the utility of the product. *See Freund v. Cellofilm Properties, Inc.*, 87 N.J. 229, 238, n. 1, 432 A.2d 925, 930 n. 1 (1981). Use of a risk/utility analysis in an inadequate warnings case, moreover, may well lead to absolute liability. *See O'Brien v. Muskin Corp., supra* at 192, 463 A.2d at 310 (SCHRIEBER, J., concurring and dissenting).

and the plaintiff's *burden* will be greater if negligence rather than strict liability principles are applied. In *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 501 P.2d 1153, 104 Cal.Rptr. 433 (1972), which our Supreme Court cited with approval in *Azzarello,* it was noted:

> In fact, it has been observed that the Restatement formulation of strict liability in practice rarely leads to a different conclusion than would have been reached under laws of negligence ... Yet the very purpose of our pioneering efforts in this field was to relieve the plaintiff from problems of proof inherent in pursuing negligence and warranty ... remedies, and thereby "to insure that the costs of injuries resulting from defective products are borne by the manufacturers ..."
>
> 8 Cal.3d at 133, 501 P.2d at 1162, 104 Cal.Rptr. at 442, quoting *Greenman v. Yuba Power Products Inc.,* 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1963) (citation omitted).

And the Washington Supreme Court has said that

> the objective of the rule of strict liability with respect to dangerous products is defeated if a plaintiff is required to prove that the defendant was negligent, or the latter is allowed to defend upon the ground that he was free of negligence. It is the adequacy of the warning which is given, or the necessity of such a warning which must command the jury's attention, not the defendant's conduct.
>
> *Little v. P.P.G. Industries, Inc., supra,* 92 Wash.2d at 121, 594 P.2d at 914.[8]

■ It was on the basis of the distinction between products liability theory, under which the defendant as manufac-

---

**8.** While "[t]he Pennsylvania Supreme Court, perhaps more than any other state appellate court in the nation, has been emphatic in divorcing negligence concepts from product-liability doctrine," *Conti v. Ford Motor Company,* 578 F.Supp. 1429, 1434 (E.D.Pa.1983), other courts adhere to the view that strict liability law should remain distinct from negligence in the area of inadequate warnings. *See, e.g., Anderson v. Heron Engineering Co., Inc.,* 198 Colo. 391, 604 P.2d 674 (1979); *Patricia R. v. Sullivan,* 631 P.2d 91 (Alaska 1981); *Freund v. Cellofilm*

turer or supplier is guarantor of its product, and negligence theory, under which the defendant is held to the standard of a reasonable man, that the Court in *Azzarello* rejected the use of the negligence term "unreasonably dangerous" in products liability cases. We see no reason to depart from that reasoning now. To the contrary, it is sound, both as a matter of legal theory and in its practical consequences. Thus, quite independently of the precedential authority of *Azzarello*, we hold, as the Supreme Court did there, that in a strict liability case, principles of negligence have no place.[9]

This conclusion reached, we may consider how the trial court should on retrial instruct the jury so as to comply with *Azzarello*.

*Properties, Inc.,* supra; *Little v. P.P.G. Industries, Inc.,* 92 Wash.2d 118, 594 P.2d 911 (1979); *Cavers v. Cushman Motor Sales, Inc., supra.* Other jurisdictions, however, have not adopted Section 402A and therefore permit plaintiffs to recover in what is called products liability only upon proof of negligence or breach of warranty. *See, e.g., Cottom v. McGuire Funeral Service, Inc.,* 262 A.2d 807, 809 (D.C.App.1970); *Codling v. Paglia,* 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973). Other states adhere to the Section 402A formulation: A plaintiff must prove that the product that caused his injuries was defective and unreasonably dangerous. *See, e.g., Rogers v. Unimac Co., Inc.,* 115 Ariz. 304, 565 P.2d 181 (1976). In others, the plaintiff must prove that the product was unreasonably dangerous. *See, e.g., Lawson v. G.D. Searle & Co.,* 64 Ill.2d 543, 1 Ill.Dec. 497, 356 N.E.2d 779 (1976); *Lester v. Magic Chef, Inc.,* 230 Kan. 643, 641 P.2d 353 (1982).

9. It may be noted that special problems, which Judge WIEAND alludes to, may be posed when in a products liability-failure to warn case the defendant raises the so-called "state of the art" defense. *See* Concurring and Dissenting at 436-437. In this regard, the New Jersey Supreme Court recently held in a state of the art case, *Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374 (1984), that "[w]hen the strict liability defect consists of an improper design or warning, reasonableness of the defendant's conduct is a factor in determining liability." *Id.* at 451, 479 A.2d at 385. This case is of course not a state of the art case, and we therefore need not now consider whether when a seller alleges that at the time of the sale it could not have known the dangers of its product, the reasonableness of its conduct may be considered. *But see Leibowitz v. Ortho Pharmaceutical Corp.,* 224 Pa.Super. 418, 434, 307 A.2d 449, 458 (1973) ("[a] warning should not be held improper because of subsequent revelations.") (Opinion in Support of Affirmance by HOFFMAN, J.).

In *Azzarello*, after stating that "a jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for its intended use," 480 Pa. at 559, 391 A.2d at 1027 (footnote omitted), the Court stated that an "adequate charge" is the one contained in Pennsylvania Standard Jury Instruction 8.02 (Civil) Subcommittee Draft (June 6, 1976). It was this charge that the trial court followed,[10] and as we have indicated, while we find no error in its instruction, at least, none rising to the level of reversible error, the instruction could, and therefore on retrial should, be improved.

Some commentators have criticized the instruction approved in *Azzarello*, in a manner supportive of appellant's view that the trial court's instruction here had the effect of

10. The trial court instructed the jury as follows:
Now, defective condition—and we're talking about the tire in question here—is not limited to defects in design or manufacture. The seller must provide with the product every element necessary to make it safe for use. One such element may be warnings or instructions concerning use of the product.

A seller must given such warnings and instructions as are required to inform the user or consumer of the possible risks and inherent limitations of its product.

And, as I've said, the question of due care, as far as Sears is concerned, is irrelevant. Under the Strict Liability Doctrine the emphasis is on the product and the danger it poses to the public, if any, while under the negligent conduct the emphasis is on the reasonableness of the conduct of the defendant.

Where warnings or instructions are required to make a product non-defective, it is the duty of the manufacturer to provide such warnings in a form which will reach the ultimate consumer and inform the risks and inherent limitations of a product.

It is the plaintiff's contention that the only form which will guarantee reaching the ultimate consumer of a tire is to imprint the warnings on the tire itself.

Now, of course, this is one of the questions that you have to decide. Was there, first of all, a condition that you might consider under this category? If there was, was the manufacturer, or in this case Sears, required to give any further warnings to the ultimate consumer? And if so, what sort of warnings would it be required to show?

R.R. 1023a.

After giving this instruction, the court, in response to objections by counsel, gave an additional instruction, which we shall discuss below.

making appellant an insurer rather than guarantor of its
product:

> Is there any product that cannot be made safer in some
> way? This instruction [*Azzarello* 's] calls forth fantastic
> cartoon images of products, both simple and complex,
> laden with fail-safe mechanism atop fail-safe mechanism.
> Birnbaum, Defect: From Negligence [to Warranty] to
> Strict Liability to Negligence, 33 Vand.L.Rev. 593, 637
> (1980).

*See also* Henderson, Renewed Judicial Controversy Over
Defective Product Design: Toward the Preservation of an
Emerging Consensus, 63 Minn.L.Rev. 773, 800–01 (1980).

This criticism, however, seems to us to have merit only in
the abstract. In the abstract, there might be something to
its claim that the jury, instructed that "the product ...
must be provided with *every* element necessary to make it
safe for its intended use," will conjure up "fantastic im-
ages" of mechanisms that *might* by some stretch of imagi-
nation have been added to the product to make it safe*er*.
But as a practical matter, we believe, the jury will make its
decision in the context of the testimony it has heard and the
parties' respective contentions. Whatever force the criti-
cism of the *Azzarello* instruction may have in the abstract
can be met by adapting the instruction to the facts of the
particular case. Here, such an adaptation might be accom-
plished somewhat as follows.

▓▓▓ The instruction approved by the Court in *Azzarello*
starts with the statement that "[t]he supplier of a product is
the guarantor of its safety." This might be expanded by
adding a brief explanation of the distinction between a
"guarantor" and an "insurer"—a distinction critical to the
law of products liability, as we have discussed. Thus the
jury might be told: "A guarantor is not an insurer. An
insurer of a product is responsible if the user [sometimes
"consumer" will be the better word, depending upon the
sort of product in question] of the product is injured by the
product in some way. But a guarantor of a product is

responsible only if the user of the product is injured as a result of a defect in the product." [11]

Next, the jury might be told, "You must therefore decide whether, when the product left the supplier's control, there was a defect in it," the instruction then continuing as required by *Azzarello,* with the language approved in *Azzarello* being adapted to this case as a warnings case. For example: "A product otherwise properly made is defective if the supplier does not adequately warn of the dangers of the product. If you find that when the product left the supplier's control, it lacked the warnings necessary to make it safe for its intended use, then the product was defective, and the supplier is liable for all harm caused by the defect." [12]

Finally, these abstract principles should be made concrete by specific reference to the testimony. Thus in this case the jury might be told: "This means that you must decide whether, as the plaintiffs contend, the radial tire supplied by the defendant was unsafe for its intended use because it lacked a warning that it should not be mixed with non-radial tires. If you find that because it lacked such a warning, the

11. The trial court did explain that the manufacturer is the guarantor, not an insurer, of its product:
> I've been asked to charge you that a manufacturer is effectively the guarantor of his product's safety. Our Courts have determined that a manufacturer by marketing and advertising his product impliedly represents that it is safe for its intended use. And to that we'll add that the manufacturer of a product is not the insurer of all injuries caused by the product.
> In order for defendant Sears to be liable for the minor plaintiff's injuries, those injuries must have been caused by a defective condition of the product. And that means not that there was a defect in the tire but that the tire was defective because it didn't contain the legend about mixing a radial with bias belted tires. That is the allegation of the plaintiffs. That is the defect that they are alleging. R.R. 1043a–1044a.

While this addition did explain the responsibility of the manufacturer, the distinction between a guarantor and insurer would have been clearer if the court had also defined the term "insurer."

12. While the trial court's explanation that the jury must find that the plaintiff's injuries were caused by the defective condition of the tire, was adequate, *see* note 11, *supra,* the language we suggest more closely parallels that of the *Azzarello* instruction.

tire was unsafe for its intended use, then you should find it defective."

Of course, these suggestions, especially the last, are not offered with the intent that they be repeated verbatim. Exactly what words should be used must depend upon the evidence and the parties' respective contentions as developed at retrial.

Nor should it be assumed that under such an instruction the supplier will always, or necessarily, be found liable— which is perhaps the fear underlying the concurring and dissenting opinion. It may be that either the product or the risk involved is such that as a matter of social policy, strict liability should not be imposed. *See, e.g.,* the plurality opinion in *Lobianco v. Property Protection, Inc., supra.* Or it may be that the product did not lack what the plaintiff claims it should have had. Or it may be that although the product did lack what the plaintiff claims it should have had, still, that fact was not the cause of the plaintiff's injury. It is this last possibility that seems to us to lie at the heart of this case. As we have said, we have no difficulty in deciding that as a matter of social policy, this is a case in which a jury, on proper instruction, could impose strict liability. And there is no question that appellant's radial tire lacked the warning appellees claim it should have had. But the question remains whether appellees will be able to prove at retrial what they did not prove at trial: that the mixture of radial and non-radial tires caused the accident. As already discussed,[13] there will be no need for the jury on retrial to consider whether the tire, unaccompanied by further warning than was given, was defective unless it is first proved through qualified expert testimony that the mixture of radial and non-radial tires caused the accident. In instructing the jury on retrial, therefore, the trial court should make it clear that only if the jury answers this question affirmatively need it consider the further question whether the tire was defective, that is, whether the radial tire that was placed on the car before the accident lacked

13. *See* text *supra,* page 46.

the directions and information necessary to make it safe for its intended use.

The judgment is vacated and the case remanded for new trial generally, the trial to be conducted consistent with this opinion.

Jurisdiction is relinquished.

WIEAND, J., files a concurring and dissenting opinion in which ROWLEY, J., joined.

WIEAND, Judge, concurring and dissenting:

A jury found that Sears, Roebuck & Company (Sears) had marketed a defective, steel-belted, radial tire because it failed to imprint on the wall of the tire a warning against using it in conjunction with non-radial tires. On appeal from a judgment entered on the verdict, Sears contends (1) that the adequacy of the warning was submitted to the jury improperly and on inadequate instructions; (2) that the trial court erred in permitting opinion testimony from witnesses who were not properly qualified as experts; (3) that the trial court erred in several evidentiary rulings; and (4) that the court erred in requiring the jury to apportion fault among Sears, whose liability was predicated upon principles of strict liability, and other defendants whose liability depended upon principles of negligence. I agree with the majority that the trial court improperly received expert opinion testimony from witnesses who were not qualified to give such testimony. In my judgment, however, a new trial is also required because the trial court gave inadequate instructions to the jury regarding the sufficiency of the warning given by the manufacturer.

On November 2, 1977, Nicholas Mallis, Jr. observed that the front, right tire on his grandfather's 1971 Plymouth Fury was flat. All tires were then non-radial tires. Mallis replaced the flat tire with a used, steel-belted, radial tire which he found lying in the driveway of his grandfather's home. The tire had been distributed originally by Sears, and its name was imprinted thereon. There was evidence

that the tire had been in the trunk of the vehicle as a spare when the grandfather purchased the vehicle in a used condition from General Services Administration, an agency of the United States Government.

On the following day, November 3, 1977, Mallis took the car to school. Because bus service was not available after school that day, Mallis offered a ride to seven of his classmates at Archbishop Carroll High School. One of his classmates, Joann Dambacher, took a position in the rear seat of the Mallis vehicle. It was drizzling at the time and there were wet leaves on the road as Mallis drove toward an S-curve on Matson Ford Road in Radnor Township, Delaware County. Mallis negotiated the first part of the curve at a speed of 20–25 m.p.h. but lost control of the vehicle when it slid to the right during the second part of the curve. The vehicle went over an embankment and struck a tree. Joann Dambacher was seriously injured.

Joann's parents filed suit against Nicholas Mallis and his grandfather on November 17, 1977. Sears was joined as a party defendant on June 5, 1978, and the Pennsylvania Department of Transportation (PennDot) was joined on October 31, 1979. The court entered a compulsory non-suit in favor of the grandfather at trial. A jury awarded damages of $810,000.00 and apportioned fault as follows: Mallis—50%; Sears—45%; and PennDot—5%.[1] The trial court subsequently awarded a new trial but limited the new trial to the issue of damages. It caused judgment to be entered against Sears on the issue of liability.

In reviewing the denial of Sears' motion for judgment n.o.v., several principles must be kept clearly before us.

A judgment n.o.v. may be entered only in a clear case. In considering such a motion, a reviewing court is required to consider the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner. *Claytor v. Durham*, 273 Pa.Super.

---

1. PennDot had settled prior to trial for $87,500.00 and had taken a joint tortfeasor's release.

571, 576, 417 A.2d 1196, 1199 (1980). A judgment n.o.v. is proper only where the facts are such that no two reasonable persons could fail to agree. *Peair v. Home Association of Enola Legion No. 751*, 287 Pa.Super. 400, 409, 430 A.2d 665, 670 (1981); *Kiely v. Southeastern Pennsylvania Transportation Authority*, 264 Pa.Super. 578, 580, 401 A.2d 366, 367 (1979).

*Sperrazza v. Cambridge Mutual Fire Insurance Co.*, 313 Pa.Super. 60, 64 n. 2, 459 A.2d 409, 411 n. 2 (1983). See: *Feld v. Merriam*, 314 Pa.Super. 414, 422, 461 A.2d 225, 229 (1983); *Spraggins v. Shields*, 310 Pa.Super. 408, 410, 456 A.2d 1000, 1001 (1983).

The plaintiffs produced witnesses who testified, over objection, that the mixing of the Sears radial tire with three non-radial tires was dangerous and a cause of the accident. This testimony, if believed, was relevant to Sears' duty to warn and also to the cause of the accident. A jury could have found that Sears was strictly liable for a tire that was defective without adequate warning regarding its use and that its failure to give adequate warning was a substantial factor in causing the accident. Other possible causes, such as Mallis' lack of driving experience, overcrowding of the vehicle, poor tire treads, a wet and defectively constructed highway, were for the jury's consideration but did not compel a finding that the allegedly defective tire had not been a substantial factor. See generally: *Gill v. McGraw Electric Co.*, 264 Pa.Super. 368, 399 A.2d 1095 (1979) (compulsory nonsuit improperly entered in favor of suppliers of electric range in suit alleging strict liability in tort). Cf. *Barth v. B.F. Goodrich Tire Co.*, 265 Cal.App.2d 228, 71 Cal.Rptr. 306 (1968) (a jury question is presented regarding a manufacturer's strict liability for failing to give adequate warning of dangerous propensity of tires when used on a vehicle overloaded with passengers); Annot., Products Liability: Liability for Injury or Death Allegedly Caused by Defective Tire, 81 A.L.R.3d 318 (1977).

Section 402A of the Restatement (Second) of Torts [2] was adopted and made a part of the substantive law of this Commonwealth by the Supreme Court in *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). Pursuant to this rule of law, a seller of products is strictly liable for physical harm caused by a product sold in a defective condition unreasonably dangerous to the user. See: *Sherk v. Daisy-Heddon,* 498 Pa. 594, 450 A.2d 615 (1982); *Azzarello v. Black Bros. Co.,* 480 Pa. 547, 391 A.2d 1020 (1978); *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975) (plurality opinion); *Kuisis v. Baldwin-Lima-Hamilton Corp.,* 457 Pa. 321, 319 A.2d 914 (1974); *Evans v. Thomas,* 304 Pa.Super. 338, 450 A.2d 710 (1982); *Smialek v. Chrysler. Motors Corp.,* 290 Pa.Super. 496, 434 A.2d 1253 (1981); 1 R. Hursh and H. Bailey, *American Law of Products Liability 2d* § 4:10 (1974). Strict liability in tort, however, is not the same as absolute liability. Suppliers of products are not insurers against harm. Absent a showing of defect, the supplier of a product has no liability under Section 402A. See: *Azzarello v. Black Bros. Co., supra* 480 Pa. at 553–554 & n. 5, 391 A.2d at 1024 & n. 5; *Berkebile v. Brantly Helicopter Corp., supra,* 462 Pa. at 94, 337 A.2d at 898. Accord: Restatement (Second) of Torts § 402A, comment g; J. Dooley, *Modern Tort Law* § 35.37 (1977); W. Prosser, *Law of Torts* § 99 (4th ed. 1971); J. Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 828 (1973).

**2.** Section 402A of the Restatement (Second) of Torts provides as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Definition of the term "defective" in Section 402A cases has had a turbulent history and has received less than uniform and consistent treatment. Courts and commentators alike have devoted substantial effort to achieving a consistent, workable definition of the term "defect." See generally: W. Kimble & R. Lesher, *Products Liability* §§ 53, 54 (1979); W. Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles*, 45 Mo.L.Rev. 579 (1980); R. Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn.L.R. 363 (1965). The requirement that a product be defective implies that something must be wrong with the product. J. Wade, *supra*, 44 Miss.L.J. at 830. The prevailing interpretation of the term "defective" is that the product does not meet the reasonable expectations of the ordinary consumer as to its safety. W. Prosser, *supra* § 99. See: *Burch v. Sears, Roebuck & Co.*, 320 Pa.Super. 444, 463, 467 A.2d 615, 625 (1983) (Dissenting Opinion by Wieand, J.), quoting *Cornell Drilling Co. v. Ford Motor Co.*, 241 Pa.Super. 129, 136, 359 A.2d 822, 825 (1976); 1 R. Hursh & H. Bailey, *supra* § 4:12; W. Kimble and R. Lesher, *supra* § 54; W. Keeton, *supra*, 45 Mo.L.Rev. at 588–595. In this Commonwealth, "the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Azzarello v. Black Bros. Co.*, *supra* 480 Pa. at 559, 391 A.2d at 1026 (footnote omitted). See also: *Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 32, 319 Pa.2d 903, 907 (1974); *Burch v. Sears, Roebuck & Co.*, *supra* 320 Pa.Super. at 450, 467 A.2d at 618; *Meyer v. Heilman*, 307 Pa.Super. 184, 188, 452 A.2d 1376, 1378 (1982), *overruled on other grounds*, 503 Pa. 472, 469 A.2d 1037 (1983); *Smialek v. Chrysler Motors Corp.*, *supra* 290 Pa.Super. at 502, 434 A.2d at 1256.

Actions under Section 402A fall into three basic categories: (1) products allegedly unsafe because of a manufacturing defect; (2) products allegedly unsafe because of a defect in design; and (3) products allegedly unsafe because

of a failure to provide adequate warnings or instructions to insure safe use of the product. See: *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204, 207 (1983); *Wiseman v. Goodyear Tire and Rubber Co.*, 29 Wash.App. 883, 886, 631 P.2d 976, 978 (1981); 2 L. Frumer & M. Friedman, *Products Liability* § 16A[4][f][i] (rev. ed. 1983); W. Keeton, *supra,* 45 Mo.L. Rev. at 585–587; Comment, *Is There a Distinction Between Strict Liability and Negligence in Failure to Warn Actions?* 15 Suffolk U.L.Rev. 983, 983 (1981). See also: W. Prosser, *supra* § 99.

The existence of a manufacturing defect can be most readily understood. Where a product, at the time it leaves the seller's hands, fails to comport with its intended design and is unsafe for normal handling or use, it is defective. See: *Phipps v. General Motors Corp.*, 278 Md. 337, 344, 363 A.2d 955, 959 (1976), citing 2 L. Frumer & M. Friedman, *supra* § 16A[4][f][iii]; *O'Brien v. Muskin Corp.*, 94 N.J. 169, 180, 463 A.2d 298, 304 (1983). "The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from foreign objects contained in the product, from decay or deterioration before sale, or from the way in which the product is [manufactured] or packed." Restatement (Second) of Torts § 402A, comment h. See: *Sochanski v. Sears, Roebuck and Co.*, 689 F.2d 45 (3d Cir.1982) (defective tire on garden cart); *Bialek v. Pittsburgh Brewing Co.*, 430 Pa. 176, 242 A.2d 231 (1968) (explosion of bottle); *Evans v. Thomas, supra* (explosion of odorless propane gas). See generally: W. Keeton, *supra,* 45 Mo.L.Rev. at 585–586. The burden of proving that the product was defective at the time it left the seller, of course, is upon the plaintiff. See: *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 758 (3d Cir.1977); *Wright v. Federal Machine Co.*, 535 F.Supp. 645, 649 (E.D.Pa.1982); *Sherk v. Daisy-Heddon, supra* 498 Pa. at 598, 450 A.2d at 617; *Berkebile v. Brantly Helicopter Corp. supra* 462 Pa. at 94, 337 A.2d at 898; *Evans v. Thomas, supra* 304 Pa.Super. at 344, 450 A.2d at

712; *Gill v. McGraw Electric Co., supra* 464 Pa.Super. at 378, 399 A.3d at 1100–1101; *Lenkiewicz v. Lange,* 242 Pa.Super. 87, 91, 363 A.2d 1172, 1175 (1976) (plurality opinion). These principles of law have been uniformly accepted. The only remaining area of substantial dispute pertains to evidentiary issues, i.e., the circumstances under which a defect can be inferred at the time the product left the manufacturer or seller.

A product may also be deemed defective even though it comports in all respects to its intended design. It may be defective because of a defect in the design of the product. In *Azzarello v. Black Bros. Co., supra,* the Supreme Court held that a supplier must provide a product "which is designed to make it safe for the intended use. Under this standard, the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for its intended use." *Id.* 480 Pa. at 559, 391 A.2d at 1027 (footnote omitted). This standard requires, inter alia, that the product be measured against the "state of the art." The product must be measured against that which was feasible in light of the technology which existed at the time the product was designed. See: W. Kimble & R. Lesher, *supra* § 228. One must ask, "What could reasonably have been done technologically and economically to reduce the risk of harm?"

An additional and perhaps more meaningful standard in design defect cases would require the utility of the product to be balanced against the risk inherent in its use. See: *McKay v. Sandmold Systems, Inc.,* 333 Pa.Super. 235, 482 A.2d 260 (1984). See also: 2 L. Frumer & M. Friedman, *supra* § 16A[4][f][iv]; W. Keeton, *supra,* 45 Mo.L.Rev. at 592–593. Thus, a knife cannot be found defective merely because it cuts; its utility outweighs the risk involved in normal use. See generally: *Berkebile v. Brantly Helicopter Corp., supra* 462 Pa. at 95, 337 A.2d at 899; *Evans v. Thomas, supra* 304 Pa.Super. at 344, 450 A.2d at 712; Restatement (Second) of Torts § 402A, comment i; W.

Prosser, *supra* § 99. On the other hand, a product may be defective because its usefulness is outweighed by the dangerous propensities inherent in its design. Thus, a pesticide's limited value may be so outweighed by its propensity for harm that the manufacturer should be held strictly liable for the harm which it causes. Similarly, a machine may be found defective because the risk posed by some aspect of its design outweighs its utility. See: *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 432, 143 Cal.Rptr. 225, 238, 573 P.2d 443, 456 (1978) ("high-lift loader" designed to lift heavy loads on varying terrains could be found defective for lack of stabilizers, seat belt, roll bar, and properly protected leveling mechanism); *Ontai v. Straub Clinic and Hospital, Inc.*, 659 P.2d 734, 739–740 (Hawaii 1983) (x-ray table designed to raise patient to vertical position lacking adequate locking mechanism for foot rest); *Voss v. Black & Decker Mfg. Co.*, *supra* 59 N.Y.2d at 108, 463 N.Y.S.2d at 402, 450 N.E.2d at 208 (blade guard on circular saw which allowed excessive amount of blade to be exposed). When a balancing test is applied, "[t]he utility of the product must be evaluated from the point of view of the public as a whole, because a finding of liability for defective design could result in the removal of an entire product line from the market." *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 807, 395 A.2d 843, 846 (1978). The resolution of such an issue depends upon social policy. *Azzarello v. Black Bros. Co.*, *supra* 480 Pa. at 558, 391 A.2d at 1026. Some products are so important that a manufacturer must be allowed to avoid liability if he has given adequate warnings and/or instructions regarding safe and proper use of the product. "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." Restatement (Second) of Torts § 402A, comment j. See: *Incollingo v. Ewing*, *supra* 444 Pa. at 287, 282 A.2d at 219; *Pegg v. General Motors Corp.*, 258 Pa.Super. 59, 77, 391 A.2d 1074, 1083 (1978).

The converse is also true. A product can be found defective if it lacks adequate warnings or instructions. See: *Brown v. Caterpillar Tractor Co.*, 696 F.2d 246, 255 n. 20 (3d Cir.1982); *Greiner v. Volkswagenwerk Aktiengesellschaft*, 540 F.2d 85, 92–93 (3d Cir.1976); *Berkebile v. Brantly Helicopter Corp.*, *supra* 462 Pa. at 100, 337 A.2d at 902; *Incollingo v. Ewing*, *supra* 444 Pa. at 287, 282 A.2d at 219; *Pegg v. General Motors Corp.*, *supra* 258 Pa.Super. at 77, 391 A.2d at 1083.

In the instant case, the evidence showed that Sears in fact had issued instructions concerning the use of its steel-belted radial tires. Those instructions were as follows:

Selection—IDEALLY, ALL FOUR TIRES SHOULD BE OF THE SAME CONSTRUCTION–TYPE (all bias ply, all bias-belted, or all radial) and of the same aspect ratio (all 82 series, all 78 series, all 70 series, or all 60 series). "Aspect ratio" refers to the ratio of the height of the tire in cross section to its width. For example, the cross section height of a "78 series" tire is 78% of its cross section width. If it is necessary to mix tire construction-types or aspect ratios, those with the highest traction capabilities should be mounted on the rear wheels, even on front-wheel drive vehicles.

In general, traction capabilities are as follows: Radial (best), bias-belted (next), bias-ply (next). With respect to aspect ratios, the lower the series number, the greater the traction. For example, a 70 series tire can be expected to provide better traction than a 78 series tire of the same construction-type. Do not mix tires of different construction-type or aspect ratio on the same axle.

Sizing—FOLLOW VEHICLE MANUFACTURER'S SPECIFICATIONS. It is acceptable and often beneficial to up-size one size, but tires smaller than vehicle specifications should never be used. All four tires should be the same size.

These instructions had been contained in a pamphlet issued by Sears in conjunction with the warranty issued with each new tire sold. The plaintiffs contended that this warning

was inadequate. They argued that a more unequivocal warning should have been embossed on the side wall of the tire itself.

Despite language to the contrary in some decisions, most authorities are agreed that a determination of the adequacy of warnings can be made only by borrowing and using negligence concepts.[3] Thus, Dean Keeton writes:

> [A] product may be defective as marketed because of a failure to adequately warn, or a failure to use proper means to warn about a risk or hazard related to the way the product was designed. Although this begins to involve design hazards, liability is imposed on the ground that the seller or manufacturer failed adequately to warn about some risk or hazard, or failed adequately to instruct about how to avoid the risk or harm. Under this approach, the product is allegedly defective as marketed because of the failure to properly present it to purchasers and users.
>
> *Notwithstanding what some courts have said, in establishing this ground of recovery, the plaintiff in most states must prove negligence in the failure to warn properly. There will be no liability in these cases without a showing that the defendant knew or should have known of the risk or hazard about which he failed to warn. Moreover, there will be no liability unless the seller or manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public.*
>
> Although this ground of recovery is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability better described as the sale of a product in a defective condition.

W. Keeton, *supra*, 45 Mo.L.Rev. at 586–587 (footnotes omitted) (emphasis added). See also: W. Kimble & R. Lesher, *supra* § 193. See generally: 2 L. Frumer & M.

---

**3.** The defect alleged in *Azzarello* was a design defect. The Supreme Court's holding in that case does not preclude the use of negligence principles in cases where the alleged defect is a failure to give adequate warning.

Friedman, *supra* § 16A[4][f][vi]; J. Beasley, *Products Liability and the Unreasonably Dangerous Requirement* 480 (1981); J. Wade, *Strict Tort Liability of Manufacturers*, 19 Sw.L.J. 13 (1965); Comment, *supra*, 15 Suffolk U.L.Rev.

The failure to recognize this interplay between strict liability and negligence principles in failure to warn cases has caused considerable confusion. Thus, in *Berkebile v. Brantly Helicopter Corp., supra,* the opinion written for the Court, but representing the views of only two Justices, suggested that the reasonable man standard for determining negligence had no place in a case seeking to impose strict liability under Section 402A for a failure to warn. Perhaps as a matter of academic purity, an attempt to eliminate standards of reasonableness from strict liability in products liability cases can be applauded. In actual practice, however, such an approach is not feasible in failure to warn cases. This is particularly so where, as here, the issue is not whether notice was given but whether the notice given was adequate. To ask a jury to determine whether a tire was "defective" because of inadequate warnings without defining "defective" and without giving the jury any objective standard by which to measure the adequacy of the warning is to invite pure speculation. As Dean Wade has observed, "[t]o use [the term 'defective'] without defining it to the jury is almost to ensure that they will be misled." J. Wade, *supra*, 44 Miss.L.J. at 832. See: *Barker v. Lull Engineering Co., supra*, 20 Cal.3d at 428, 143 Cal.Rptr. at 225, 573 P.2d at 453.

Therefore, a majority of jurisdictions has held, as did the court in *In re Air Crash Disaster at Washington, D.C.,* 559 F.Supp. 333 (D.D.C.1983), that "the issue of a failure to warn is governed by a negligence standard." *Id.* at 345, citing *Young v. Up-Right Scaffolds, Inc.,* 637 F.2d 810, 814 (D.C.Cir.1980) (if a defendant was not negligent in labelling a product, product is not unreasonably unsafe). Accord: *Basko v. Sterling Drug, Inc.,* 416 F.2d 417, 426 (2nd Cir. 1969) (Restatement adopts the ordinary negligence concept of duty to warn); *Hall v. E.I. DuPont De Nemours & Co.,*

345 F.Supp. 353, 368 (E.D.N.Y.1972) (whether a product is "defective" because of inadequate warnings depends on the negligence standards of "foreseeability, seriousness, and cost of preventing"); *Russell v. G.A.F. Corp.*, 422 A.2d 989, 991 (D.C.App.1980) (under theories of negligence and strict liability, the manufacturer's duty to provide warnings "is the same: ordinary care"); *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 434, 581 P.2d 271, 279 (1978) (whether product is defective because of a failure to warn depends upon the negligence standards of foreseeability, seriousness, and cost of preventing); *Jonescue v. Jewel Home Shopping Service*, 16 Ill.App.3d 339, 343, 306 N.E.2d 312, 315 (1974) (in failure to warn case, differences between negligence and strict liability "become immaterial"); *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 57–58, 661 P.2d 348, 362–363 (1983) (standard in failure to warn case under both negligence and strict liability theories is the same: ordinary care); *Wolf-gruber v. Upjohn Co.*, 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 97 (1979), *aff'd mem.*, 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980) (failure to warn plaintiff required to prove negligence). Contra: *Holloway v. J.B. Systems, Ltd.*, 609 F.2d 1069 (3d Cir.1979).

The majority declines to join this growing consensus. Instead, it holds that if a supplier has failed to give warnings adequate to make its product safe, the product is defective. (At 426). This is an explosive concept. It may well become a plaintiff's backup theory for recovery in all products liability cases. Under the majority's test, neither foreseeability nor reasonableness is for the jury's consideration; these traditional negligence concepts never enter the equation, not even in close cases. Rather, the supplier will have an absolute duty to warn users of its product of any injury which may result from such use. Under this standard, a manufacturer of knives who fails to warn that a knife may cut will manufacture a defective product. And an automobile manufacturer may well be charged with placing a defective automobile on the market if he fails to warn of the danger inherent in excessive speed. The major-

ity, moreover, has failed to recognize and its rule will prove unworkable with respect to dangers about which the manufacturer learns for the first time after its product has been manufactured.

I am persuaded that the application of negligence standards presents a better approach.[4] Thus, in cases where a

4. A negligence standard has been adopted by the Modern Uniform Products Liability Act. Section 104[c], 44 Fed.Reg. 62, 721 (1979) provides:

**(C) The Product Was Unreasonably Unsafe Because Adequate Warnings or Instructions Were Not Provided.**

(1) In order to determine that the product was unreasonably unsafe because adequate warnings or instructions were not provided about a danger connected with the product or its proper use, the trier of fact must find that, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms and the seriousness of those harms rendered the manufacturer's instructions inadequate and that the manufacturer should and could have provided the instructions or warnings which claimant alleges would have been adequate.

(2) Examples of evidence that is especially probative in making this evaluation include:

(a) The manufacturer's ability, at the time of manufacture, to be aware of the product's danger and the nature of the potential harm;

(b) The manufacturer's ability to anticipate that the likely product user would be aware of the product's danger and the nature of the potential harm;

(c) The technological and practical feasibility of providing adequate warnings and instructions;

(d) The clarity and conspicuousness of the warnings or instructions that were provided; and

(e) The adequacy of the warnings or instructions that were provided.

(3) In any claim under this Subsection, the claimant must prove by a preponderance of the evidence that if adequate warnings or instructions had been provided, they would have been effective because a reasonably prudent product user would have either declined to use the product or would have used the product in a manner so as to have avoided the harm.

(4) A manufacturer shall not be liable for its failure to warn or instruct about dangers that are obvious; for "product misuse" as defined in Subsection 112(C)(1); or for alterations or modifications of the product which do not constitute "reasonably anticipated conduct" under Subsection 102(G).

(5) A manufacturer is under an obligation to provide adequate warnings or instructions to the actual product user unless the manufacturer provided such warnings to a person who may be reasonably expected to assure that action is taken to avoid the harm, or that the risk of the harm is explained to the actual product user.

failure to give adequate warning or instruction is alleged, the duty to warn must be measured against foreseeability and reasonableness. There can be no liability for a failure to warn without a showing that the defendant supplier failed to give reasonable warning of risks or hazards of which he knew or should have known. See: *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 344 (5th Cir. 1982) (Texas law), citing *Borel v. Fiberboard Paper Products Corp.*, 493 F.2d 1076, 1088 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Karjala v. Johns-Manville Products Corp.*, 523 F.2d 155, 158 (8th Cir.1975) (Minnesota law); *Garrison v. Rohm and Haas Co.*, 492 F.2d 346, 352 (6th Cir.1974) (Kentucky law); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 140 n. 26 (3d Cir.1973) (Pennsylvania law); *Giordano v. Ford Motor Co.*, 165 Ga.App. 644, 645, 299 S.E.2d 897, 899 (1983); *Woodill v. Parke Davis & Co.*, 79 Ill.2d 26, 35–36, 37 Ill.Dec. 304, 308–309, 402 N.E.2d 194, 198–199 (1980); *Nissen Trampoline Co. v. Terre Haute First National Bank*, 332 N.E.2d 820, 825 (Ind.App.1975), *rev'd on other grounds*, 265 Ind. 457, 358 N.E.2d 974 (1976); *O'Brien v. Muskin Corp.*, *supra*, 94 N.J. at 179, 463 A.2d at 303; *Richards v. Upjohn Co.*, 95 N.M. 675, 679, 625 P.2d 1192, 1196 (N.M.Ct.App. 1980); *White v. Dealers Transit, Inc.*, 4 Ohio App.3d 40, 45, 446 N.E.2d 460, 466 (1980); *McKee v. Moore*, 648 P.2d 21, 23

For products that may be legally used only by or under the supervision of a class of experts, warnings or instructions may be provided to the using or supervisory expert.

For products that are tangible goods sold or handled only in bulk or other workplace products, warnings or instructions may be provided to the employer of the employee-claimant if there is no practical and feasible means of transmitting them to the employee-claimant.

**(6) Post-Manufacture Duty to Warn.**

In addition to the claim provided in Subsection (C)(1), a claim may arise under this Subsection where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured. In such a case, the manufacturer is under an obligation to act with regard to the danger as a reasonably prudent manufacturer in the same or similar circumstances. This obligation is satisfied if the manufacturer makes reasonable efforts to inform product users or a person who may be reasonably expected to assure that action is taken to avoid the harm, or that the risk of harm is explained to the actual product user.

(Okla.1982); *Bristol-Myers v. Gonzales,* 561 S.W.2d 801, 804 (Tex.1978). But see: *Patricia R. v. Sullivan,* 631 P.2d 91 (Alaska 1981); *Little v. PPG Industries, Inc.,* 19 Wash. App. 812, 579 P.2d 940 (1978), *aff'd and modified,* 92 Wash.2d 118, 594 P.2d 911 (1979). Because proof of knowledge by a defendant manufacturer or distributor regarding the risks inherent in the use of his product is not readily available to the plaintiff, however, the defendant's knowledge of the dangerous propensities inherent in his product should be presumed, and the burden of coming forward with evidence to the contrary may be placed upon the defendant manufacturer or distributor. See: J. Wade, *supra,* 44 Miss.L.J. at 838–839. See also: *Phillips v. Kimwood Machine Co.,* 269 Or. 485, 490, 525 P.2d 1033, 1035 (1974). Cf. *Voss v. Black & Decker Mfg. Co., supra,* 59 N.Y.2d at 107, 463 N.Y.S.2d at 401–402, 450 N.E.2d at 207–208 (design case).

In the instant case, a warning was in fact given. The issue for the jury was whether that warning was adequate or whether, as appellees contended, the warning should have been embossed on the side of the tire. Under the absolute duty to warn rule adopted by the majority, a jury will be compelled to find the radial tire defective because the user was not in fact warned of the danger of mixing it with nonradial tires. The better rule, I suggest, would require the supplier to exert reasonable efforts to warn users of radial tires of dangers known to the supplier or of which he should have been aware. Thus, in the instant case, the jury should have been instructed to determine whether the warning given by Sears was reasonable. This requirement of "reasonableness" will preserve "the use of familiar terms and thought processes with which courts, lawyers, and jurors customarily deal." *McKay v. Sandmold Systems, Inc., supra* 333 Pa.Super. at 242, 482 A.2d at 264, quoting *Phillips v. Kimwood Machine Co.,* 269 Or. 485, 493, 525 P.2d 1033, 1037 (1974). It will enable the law in this Commonwealth to retain concepts of strict liability envisioned by Restatement (Second) of Torts § 402A and

will avoid the flaw in *Azzarello* which "encourages juries to impose liability merely because plaintiffs have somehow been injured while using defendant's products." J. Henderson, *Renewed Judicial Controversy over Defective Product Design: Toward the Preservation of an Emerging Consensus*, 63 Minn.L.Rev. 773, 801 (1979).

The evidence in this case was conflicting. Plaintiff's experts testified that it was dangerous to mix tire types, and one of them expressed the opinion that a warning, to be adequate, should have been embossed on the side wall of the tire. Appellant's evidence showed (1) that mixing radial and non-radial tires rendered a vehicle difficult to control only when the vehicle was engaged in violent, high speed maneuvers and (2) that it was not practical to emboss a warning, with letters of adequate size, on the side of the tire. To do so would require the elimination of other, equally important instructions carried on the sides of its tires.

The trial court submitted it to the jury to determine whether Sears' radial tire was "defective" because of "inadequate" warnings regarding its use with non-radial tires on the same vehicle. When it did so, however, it gave the jury no standard by which to determine whether the tire was defective because of inadequate warnings. Without such guidance the jury could not make an intelligent decision. It had no standard by which to determine the adequacy of the warnings which Sears had given in presenting its radial tire to the public. It could not determine, because it was not instructed, whether Sears had taken the precautions which a reasonable manufacturer would have taken in instructing the public concerning the limitations to be placed upon the use of its radial tires. In my opinion, this failure by the trial court requires that a new trial be granted.

William Kelly and Walter Pruyn were called by appellees to testify as expert witnesses. They were permitted to express opinions, over objection, that the use of Sears' radial tire in conjunction with non-radial tires had caused the vehicle to steer erratically and thereby contributed to

Mallis' loss of control of the vehicle. Pruyn also expressed an opinion, over objection, that radial tires should bear an embossed warning against mixing radial and non-radial tires. This warning, he said, should appear on the side of radial tires in white letters one and one-half inches to two inches high.[5] Sears argues on appeal that these matters required knowledge and experience beyond that possessed by appellees' witnesses and that the court, therefore, erred in permitting them to testify as experts. The majority and I are agreed that there is merit in this argument.

Before the opinion testimony of an expert may be received, the subject of the inquiry "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman. . . . [Also], the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier [of fact] in his search for truth." *McCormick on Evidence* 29–30 (2nd ed. 1972) (footnotes omitted). See generally: *Rutter v. Northeastern Beaver County School District,* 496 Pa. 590, 437 A.2d 1198 (1981) (plurality opinion); *Kuisis v. Baldwin-Lima-Hamilton Corp., supra; Reardon v. Meehan,* 424 Pa. 460, 227 A.2d 667 (1967); *Steele v. Shepperd,* 411 Pa. 481, 192 A.2d 397 (1963); *Walheim v. Kirkpatrick,* 305 Pa.Super. 590, 451 A.2d 1033 (1982); *Hughes v. Emerald Mines Corp.,* 303 Pa.Super. 426, 450 A.2d 1 (1982); *Kravinsky v. Glover,* 263 Pa.Super. 8, 396 A.2d 1349 (1979); *Lebesco v. Southeastern Pennsylvania Transportation Authority,* 251 Pa.Super. 415, 380 A.2d 848 (1977); *Densler v. Metropolitan Edison Co.,* 235 Pa.Super. 585, 345 A.2d 758 (1975); 2 *Jones on Evidence* § 14:12 (6th ed. 1972).

"An expert witness has been defined as a person who possesses knowledge not within the ordinary reach and who, because of this knowledge is specially qualified to speak upon a particular subject." *Erschen v. Pennsylvania Independent Oil Co.,* 259 Pa.Super. 474, 477, 393 A.2d

---

5. He did not explain why the warning should appear only on radial tires and not also on non-radial tires.

924, 926 (1978). "The Pennsylvania standard of qualification for an expert witness is a liberal one. 'If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given his evidence is for the jury.' *Kuisis v. Baldwin-Lima-Hamilton Corp.*, [*supra*, 457 Pa. at 338, 319 A.2d at 924]." *Rutter v. Northeastern Beaver County School District, supra* 496 Pa. at 597–598, 437 A.2d at 1201. See also: *Griffith v. Clearfield Truck Rentals, Inc.*, 427 Pa. 30, 233 A.2d 896 (1967); *Reardon v. Meehan, supra; McKnight v. City of Philadelphia*, 299 Pa.Super. 327, 445 A.2d 778 (1982); *Pratt v. Stein*, 298 Pa.Super. 92, 444 A.2d 674 (1982); *Whistler Sportswear, Inc. v. Rullo*, 289 Pa.Super. 230, 433 A.2d 40 (1981). But see: *Burch v. Sears, Roebuck & Co., supra*, 320 Pa.Super. at 471 n. 4, 467 A.2d at 629 n. 4 (Dissenting Opinion by Wieand, J.); *Ragan v. Steen*, 229 Pa.Super. 515, 528, 331 A.2d 724, 736 (1974) (Concurring Opinion by Spaeth, J.). While the standard for qualifying a witness as an expert is a liberal one, it remains a well established rule that "[t]he witness must show special knowledge of the very question upon which he promises to express an opinion." *Jones Appeal*, 449 Pa. 543, 551 n. 5, 297 A.2d 117, 121 n. 5 (1972) (report of "doctor" with respect to parent's mental health and fitness as a parent inadmissible as expert opinion because, inter alia, doctor did not appear in court and did not, therefore, state area of expertise on record). See: *Duffy v. National Janitorial Services, Inc.*, 429 Pa. 334, 240 A.2d 527 (1968) (plurality opinion) (although proposed expert may have had expertise in some other field, he was not qualified as an expert with respect to fire causation, having had no formal training and very little experience with respect thereto); *Sweeney v. Blue Anchor Beverage Co.*, 325 Pa. 216, 189 A. 331 (1937) (a witness described as a "teacher of biological sciences" was unqualified as an expert with respect to what caused the breaking of a bottle of ginger ale); *Erschen v. Pennsylvania Independent Oil Co., supra* (a trooper, employed as a fire marshall for six months, was not qualified as an expert with respect to the origin of a gas explosion). In

determining whether a witness is qualified to express an opinion as an expert,

> [t]he object is to be sure that the question to the witness will be answered by a person who is fitted to answer it. His fitness, then, is a fitness to answer on that point. *He may be fitted to answer about countless other matters, but that does not justify accepting his views on the matter in hand.*

2 *Wigmore on Evidence* § 555 (Chadbourn rev. 1979) (emphasis added). See: *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 848 (10th Cir.1979); *Arnold v. Loose*, 352 F.2d 959, 962 (3rd Cir.1965) (applying Pennsylvania law); *Flick v. James Monfredo, Inc.*, 356 F.Supp. 1143, 1149 (E.D.Pa.), *aff'd mem.*, 487 F.2d 1394 (3rd Cir.1973) (applying Pennsylvania law); *Robinson v. Greeley and Hansen*, 114 Ill. App.3d 720, 727, 70 Ill.Dec. 376, 381, 449 N.E.2d 250, 255 (1983); *Barrett v. Coast Range Plywood*, 294 Or. 641, 645, 661 P.2d 926, 929 (1983); *Burch v. Sears, Roebuck & Co.*, *supra*, 320 Pa.Super. at 471–472, 467 A.2d at 629 (Dissenting Opinion by Wiead, J.); 2 *Jones on Evidence* § 14:12, *supra*.

The issue in this case called for expert testimony. The jury had to decide whether a radial tire on the right front wheel of the Plymouth Fury driven by Mallis, when the other three wheels were mounted with non-radial tires, was a substantial factor in causing Mallis to lose control while driving between 20 and 25 miles per hour. To aid the jury in its search for the answer, it was necessary that an expert witness possess knowledge, whether gained by education, experience, or both, in the field of vehicle dynamics. He had to possess sufficient knowledge or experience to enable him to understand and predict the movement of vehicles under varying circumstances. At a minimum, this required knowledge in the fields of engineering and physics.

William Kelly readily admitted that he had received neither formal education nor training in these disciplines. He was an automobile mechanic. He had performed the job of auto mechanic well and had advanced to become service

manager for an automobile dealer. However, he "didn't specialize in any mechanical things" in high school; did not attend college; "never studied engineering of any kind"; did not take any courses involving the design of tires; and received neither formal education nor informal training regarding vehicle dynamics as affected by changes in the types or conditions of tires. He had never worked for anyone whose function it was to test automobile performance as affected by changes in the types or conditions of tires. He said that he had road tested other 1971 Plymouth Fury automobiles, but the tests which he conducted were to determine, for state inspection purposes, whether there might be a mechanical problem that could not be observed by visual inspection. The tests were not made with the idea of testing the effect of mixing tires, and Kelly did not know during any given test whether, or how, the tires were mixed. He had not made tests to determine the dynamics of a vehicle moving with mixed tires and had "never read any technical articles published by a scientific or professional or engineering society." The extent of his reading on the subject had been the service manual distributed by Chrysler and the State Inspection Manual.

Kelly was permitted to give an expert opinion because he said he was an expert. His naked assertion of expertise was unsupported by education, training or experience. He should not have been permitted to express an opinion that the presence of a radial tire on the right front wheel was a substantial causative factor in the accident which caused injury to the plaintiff. He had no reasonable pretension to specialized knowledge on the subject under investigation.

The trial court's admission of Kelly's evidence was alone error requiring a new trial. Therefore, Pruyn's qualifications need not be reviewed at length. Suffice it to say that his pretension to expertise was not much greater than Kelly's. He was a retired school teacher, seventy-five years of age, who had taught automobile mechanics. Upon retirement, he became a self-styled "accident investigator." It did not appear that he had any relevant knowledge of

principles of vehicle dynamics or that he had greater experience in testing vehicles than Kelly. Not only did the evidence show an absence of any proven record of achievement in the field of automobile dynamics, but it failed to demonstrate familiarity with the design, manufacture and marketing of automobile tires about the embossment of which he was permitted to express an opinion. See: *Flick v. James Monfredo, Inc., supra* (Pruyn not qualified as "impactologist" with respect to reconstruction of motorcycle accident).

Even where the scope of a witness' education and experience may be broad enough to embrace a subject in a general way, the subject frequently is so specialized that the witness does not possess the expertise necessary to express an opinion. Thus, a manager of an automotive repair business with fifteen years experience is not qualified as an expert in accident reconstruction. *Callander v. Hunter Motor Lines, Inc.,* 327 F.2d 754 (4th Cir.1964). Similarly, an orthopedic surgeon, who has never read a text on diabetes or diabetic comas and who has no special knowledge in the field of diabetes, is not necessarily qualified to express an opinion that a driver lapsed into a diabetic coma, causing loss of control of a vehicle. *Arnold v. Loose, supra.* Also, a radiologist may not be qualified to testify as to the proper procedure to be used in chest surgery. *Hunt v. Bradshaw,* 251 F.2d 103 (4th Cir.1958). See also: *Wesley v. State,* 32 Ala.App. 383, 26 So.2d 413 (1946) (toxicologist not qualified to testify that wound was inflicted by screwdriver or similar instrument); *Gaston v. Hunter,* 121 Ariz. 33, 588 P.2d 326 (Ct.App.1978) (neurosurgeon not qualified as expert with respect to orthopedic standards of care); *Huffman v. Lindquist,* 37 Cal.2d 465, 234 P.2d 34 (1951) (autopsy surgeon not qualified as to treatment for brain injury); *Moore v. Belt,* 34 Cal.2d 525, 212 P.2d 509 (1950) (autopsy surgeon not qualified as to existing standards in practice of urology); *Dolan v. Galluzzo,* 77 Ill.2d 279, 32 Ill.Dec. 900, 396 N.E.2d 13 (1979) (physician unlicensed in podiatry not qualified to testify in

malpractice action against podiatrist); *Burrell v. Kirkpatrick*, 410 So.2d 1255 (La.Ct.App.1978) (fireman with 27 years experience as firefighter not qualified to testify on causes of fire); *E.N. Nason, Inc. v. Land-Ho Development Corp.*, 403 A.2d 1173 (Me.1979) (former superintendent of public works and construction worker from Massachusetts not qualified to testify on conditions and trade practices concerning a road construction project in central Maine); *Keefer v. C.R. Bard, Inc.*, 110 Mich.App. 563, 313 N.W.2d 151 (1981) (defendant's expert on catheters properly prohibited from expressing an opinion with respect to the absence of blood on a catheter needle in the absence of evidence of his ability to recognize or identify blood); *Swanson v. Chatterton*, 281 Minn. 129, 160 N.W.2d 662 (1968) (internist not qualified as to orthopedic surgery); *State v. Askin*, 90 Mont. 394, 3 P.2d 654 (1931) (general practitioner not qualified to testify as to brain injury); *Whitehurst v. Boehm*, 41 N.C.App. 670, 255 S.E.2d 761 (1979) (orthopedic surgeon unfamiliar with practice of podiatry not qualified to testify as to standard of care required of podiatrist); *Capan v. Divine Providence Hospital*, 270 Pa.Super. 127, 410 A.2d 1282 (1979) (anesthesiologist not qualified as to autopsy report).

The experiences of Kelly and Pruyn in the field of automobile mechanics may have embraced the subject of tires in a general way. Nothing in their training or experience, however, was sufficient to qualify them to express opinions regarding the causative effect of mixed tires on a vehicle being driven 20–25 m.p.h. on a wet roadway. Similarly, Pruyn was not qualified to express an opinion regarding the embossing of warnings on the sides of tires.

Sears contends that the trial court also erred when it refused to allow evidence of experiments conducted by Sears and designed to evaluate tire force, friction and oversteering when a radial tire has been mounted on a car with non-radial tires. The trial court excluded evidence of the experiments because the simulated conditions under which the experiments had been conducted varied from

conditions at the time of the accident. "Experiments for use in a trial to be admissible are normally held to a very strict standard and must be thoroughly authenticated before being admitted and this for the very good reason that normally the possibility exists of great divergence of conditions and the existence of a great many variables which could affect any given result." *Clover Bar, Inc. Liquor License Case*, 203 Pa.Super. 11, 14, 198 A.2d 366, 368 (1964). See: *Atene v. Lawrence*, 456 Pa. 541, 545–546 n. 5, 318 A.2d 695, 698 n. 5 (1974) (plurality opinion). The admission of such evidence is committed to the discretion of the trial court, and a determination to exclude test results because of a dissimilarity of conditions will not be reversed in the absence of an abuse thereof. *Glick v. White Motor Co.*, 458 F.2d 1287, 1294–1295 (3d Cir.1972); *Weaver v. Ford Motor Co.*, 382 F.Supp. 1068, 1072 (E.D.Pa.1974), *aff'd mem.*, 515 F.2d 506 (3d Cir.1975). See also: *Commonwealth v. Sero*, 478 Pa. 440, 387 A.2d 63 (1978). In the instant case, there was no abuse of the trial court's discretion.

The trial court permitted Sears to introduce evidence of prior accidents on Matson Ford Road in order to prove a dangerous highway condition and PennDot's knowledge thereof. However, the court refused to allow evidence of subsequent accidents. There was no error in this ruling. Moreover, even if we assume that such evidence would have served a relevant purpose, its exclusion was harmless. The only proper effect which it could have had was cumulative; it would not have aided the jury further in its search for truth. See: *Baldino v. Castagna*, 308 Pa.Super. 506, 517, 454 A.2d 1012, 1018 (1982), *rev'd on other grounds*, 505 Pa. 239, 478 A.2d 807 (1984). This is peculiarly apparent where, as here, the jury found as a fact that PennDot had been guilty of causal negligence.

Finally, Sears contends that the trial court erred when it directed the jury to apportion liability among parties whose liability depended on negligence and Sears, whose liability

depended upon principles of strict liability in tort.[6] The Pennsylvania Comparative Negligence statute provides at 42 Pa.C.S. § 7102 as follows:

(a) **General rule.**—In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

(b) **Recovery against joint defendant; contribution.** —Where recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed. The plaintiff may recover the full amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery. Any defendant who is so compelled to pay more than his percentage share may seek contribution.

Although the legislature has used the term "negligence" in defining the scope of the act, it appears to me that the term was used generically to include actions sounding in tort. In reality and more precisely, it appears that the legislature intended to enact a *comparative fault* statute. Thus, damages allowed in a tort action must be apportioned among all

---

6. The majority holds that Sears waived this argument when its counsel failed to object to the court's instruction at trial. This position is not well taken. At page 1041a of the record (page 66–X of the trial transcript), the following appears:

> "Mr. Williams: And then you said if they find against more than one the Comparative Negligence Act applies. First, we'd like an exception to that part of the charge.
>
> The Court: You may have an exception to that."

The issue was also preserved in post-trial motions and was considered by the court en banc. Therefore, it is properly before this Court for review.

defendants against whom recovery is allowed according to the proportion which each defendant's "fault" bears to the "causal fault" attributed to all defendants. In this manner the Pennsylvania statute can be interpreted consistently with the Uniform Act [7] which has been proposed for enactment by the states. To interpret the Pennsylvania statute narrowly to have application only in tort actions where recovery is premised upon "negligence" would be to create such absurd and unreasonable procedural and substantive difficulties that the statute would be rendered meaningless and impossible of application in many tort actions. This we may not do. 1 Pa.C.S. § 1922(1). See: *Bundy v. Belin,* 501 Pa. 255, 261, 461 A.2d 197, 200 (1983); *Fireman's Fund Insurance Co. v. Nationwide Mutual Insurance Co.,* 317 Pa.Super. 497, 502, 464 A.2d 431, 434 (1983); *Worley v. Augustine,* 310 Pa.Super. 178, 183, 456 A.2d 558, 561 (1983). See generally: Annot., Applicability of Comparative Negligence Doctrine to Actions Based on Strict Liability in Tort, 9 A.L.R. 4th 633 (1981). The instant case is a good example. To require apportionment of negligence between Mallis and PennDot but without considering the causative effect of Sears' fault, if any, would achieve an absurd and nonsensical result. A just result can be achieved only if the plaintiff's damages can be allocated among all parties whose fault has caused the loss. I would hold, therefore, that the trial court did not err when it called upon the jury to apportion fault among Mallis and PennDot, who were charged with negligence, and Sears, from whom recovery was sought on grounds of strict liability for distributing a product found to be defective because of inadequate warnings.

For these reasons, I concur with the majority that the judgment should be vacated and the case remanded for a new trial. However, I am of the opinion that the jury

7. The Uniform Act would define "fault" to include, inter alia, "acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability." Uniform Comparative Fault Act, Section 1(b).

should be instructed consistently with standards suggested in this Concurring and Dissenting Opinion.

ROWLEY, J., joins in this opinion.